USDC SCAN INDEX SHEET

















```
TKL    3/20/06    9:21
3:04-CV-02186    JONES V. TRIPLE STAR INC
*82*
*DECL.*
```

1   Scott J. Ferrell, SBN 202091
2   Julie R. Trotter, SBN 209675
    CALL, JENSEN & FERRELL
3   A Professional Corporation
    610 Newport Center Drive, Suite 700
4   Newport Beach, CA  92660
    (949) 717-3000
5   sferrell@calljensen.com
6   jtrotter@calljensen.com



FILED

MAR 1 7 2006

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

7   Attorneys for Defendants TRIPLE STAR, INC. DBA 7-ELEVEN
    and FIFTH STEVENSON PROPERTIES CORP.

8

9               UNITED STATES DISTRICT COURT

10             SOUTHERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12  GYPSIE JONES, | Case No.  04 CV 2186 JM (POR) |
| 13          Plaintiff, | **DECLARATION OF JULIE R.** |
| 14      vs. | **TROTTER IN SUPPORT OF DEFENDANTS' MOTION FOR** |
| 15  TRIPLE STAR, INC. dba 7-ELEVEN; | **SUMMARY JUDGMENT** |
| 16  FIFTH STEVENSON PROPERTIES | Date:  April 14, 2006 |
| 17  CORP.; and DOES 1 through 10, | Time:  11:00 a.m. |
| 18          Defendants. | Place: Dept. 6 |

[Filed concurrently with Notice of Motion;
Memorandum of Points and Authorities;
Request for Judicial Notice; Statement of
Uncontroverted Facts; Declarations of
Joseph Gengo and Sandeep Kaur;
Proposed Order]

Complaint Filed:   October 30, 2004
Trial Date:            January 9, 2006

26   I, Julie R. Trotter, hereby declare as follows:

27       1.     I am an attorney at law, duly licensed and admitted to practice law in the

28   State of California.  I am an associate of the law firm of Call, Jensen & Ferrell, counsel

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

SEV02-05:190176_1:3-17-06

DECLARATION OF JULIE R. TROTTER

1   of record for Defendants Triple Star, Inc. dba 7-Eleven and Fifth Stevenson Properties,

2   in the above-entitled action.  The facts set forth in this Declaration are based upon my

3   personal knowledge and, if called as a witness, I could and would testify competently

4   thereto.

5          2.      Attached hereto as Exhibit A is a true and correct copy of relevant excerpts

6   from the deposition of Plaintiff Gypsie Jones taken on May 24, 2005.

7          3.      On September 8, 2005, Defendants filed their initial Motion for Summary

8   Judgment papers with this Court.

9          4.      On September 15, 2005, Plaintiff filed her Request for a Rule 56(f)

10   Continuance for the purpose of conducting an additional inspection of the property.

11   Attached hereto as Exhibit B is a true and correct copy of Plaintiff's Request for a Rule

12   56(f) Continuance.

13          5.      On October 4, 2005, in response to Plaintiff's Request for a Rule 56(f)

14   Continuance, Defendants filed Objections to the same.  Attached hereto as Exhibit C is

15   a true and correct copy of Defendants' Objections.

16          6.      Shortly after filing her Request for a Rule 56(f) Continuance, on October 3,

17   2005, Plaintiff filed her own Motion for Summary Judgment.

18          7.      On November 23, 2005, the Court granted Plaintiff's Request for a Rule

19   56(f) Continuance and ordered the parties to appear before Magistrate Judge Louisa

20   Porter for Case Management Conference.  Attached hereto as Exhibit D is a true and

21   correct copy of the Court's November 23, 2005 Order.

22          8.      On December 22, 2005, Magistrate Porter issued a Revised Scheduling

23   Order Regulating Discovery and Other Pretrial Proceedings.  Attached hereto as Exhibit

24   E is a true and correct copy of the Court's December 22, 2005 Order.

25          9.      On February 27, 2006 Defendants received the Expert Disclosures, which

26   included the Expert Report of Reed Settle.  Attached hereto as Exhibit F is a true and

27   correct copy of the Expert Report of Reed Settle.  In the six months that passed since

28   Defendants first filed their motion for summary judgment, Plaintiff made no effort to

1  request a site inspection of the premises.  In fact, on August 18, 2005, Plaintiff

2  disclosed this same report of Reed Settle as part of their expert disclosures.

3       10.   7-Eleven worked with Bill Norkunas and Neal Casper regarding

4  accessibility features at this Store.

5       11.   On March 13, 2005, Defendants submitted the Expert Rebuttal Report of

6  Neal Casper.  Attached hereto as Exhibit G is a true and correct copy of the Mr.

7  Casper's Report.

8       12.   Plaintiff alleges she sent a letter to Defendants regarding her visit to the

9  Store prior to filing this lawsuit.  Attached hereto as Exhibit H is a true and correct copy

10  of Plaintiff's letter.  Similar letters have been sent by other repeat ADA plaintiffs

11  represented by Plaintiff's counsel, and this letter appears to be a "form" letter of the

12  same make and model.  Attached hereto as Exhibit I are true and correct copies of the

13  letters sent by other ADA plaintiffs represented by Plaintiff's counsel.

14

15       I declare under penalty of perjury under the laws of the United States of America

16  that the foregoing is true and correct.  Executed on this _16_ th day of March, 2006, in

17  Newport Beach, California.

18

19

20                         Julie R. Trotter

21

22

23

24

25

26

27

28

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

SEV02-05:190176_1:3-16-06             - 3 -
DECLARATION OF JULIE R. TROTTER

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

--oOo--


GYPSIE JONES,

        Plaintiff,

vs.                                    No. 04CV2186 JM (PDR)

TRIPLE STAR, INC., dba 7-ELEVEN;
FIFTH STEVENSON PROPERTIES, CORP.;
And DOES 1 through 10,

        Defendants.
_____/

**CERTIFIED
COPY**


--oOo--


<u>**DEPOSITION OF GYPSIE JONES**</u>

**RECEIVED**

Tuesday, May 24, 2005

JUN 1 0 2005

10:25 a.m.

CALL, JENSEN & FERRELL

--oOo--


Reported By:  Cynthia Bynum Palmer, CSR No. 3556



**EXHIBIT A**

## Northern California Court Reporters

**3610 American River Drive, Suite 114 ■ Sacramento, CA 95864-5922
(916) 485-4949 ■ Toll Free (888) 600-NCCR ■ Fax (916) 485-1735**

```
 1    Q        Have you ever gone by any other names?

 2    A        No, sir.

 3    Q        What is your social security number?

 4    A        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.

 5    Q        What is your home address?

 6    A        5130 Towhee, T-o-w-h-e-e, Lane, Anderson,

 7    California, 96007.

 8    Q        Where is Anderson?

 9    A        Up by Redding, California.

10    Q        In California.

11             About how far is it from Sacramento?

12    A        About two-and-a-half hours.

13    Q        Did you drive here this morning?

14    A        Yes, I did.

15    Q        Thanks for coming down.

16             Have you had any other home addresses in the

17    past two years?

18    A        Yes, I have.

19    Q        What -- what's that address?

20    A        20192 -- 20192 First Street, spelled out,

21    Cottonwood, California, 96022.

22    Q        Where is Cottonwood?

23    A        It's about ten minutes south of Anderson which

24    is about 20 minutes south of Redding.

25    Q        Okay.  Have you had any other addresses besides
```

8

1    can do that.  Okay?

2           I'd ask if there is a question pending that you

3    answer the question first and then we can take a break.

4    A      Okay.

5    Q      Have you visited the 7-Eleven No. 17825 in

6    San Ysidro?

7    A      Yes.

8    Q      How many times have you visited there?

9    A      I've been at that store three times.

10   Q      When was the first time you visited there?

11   A      I believe it was in April of 2004.

12   Q      And do you know the exact date?

13   A      No, I do not.

14   Q      Is there anything -- are there any documents

15   that you could look at that would help you refresh your

16   recollection of that date?

17   A      There are receipts.

18          MR. TAYLOR:  I'm holding a document with two

19   photocopied receipts from 7-Eleven which I am going to

20   hand to the court reporter and ask her to mark as

21   Exhibit 2.

22          (Exhibit 2 was marked for Identification.)

23   Q      (By Mr. Taylor)  Take a moment and look at

24   those documents and let me know if you recognize them.

25   A      Yes, do I recognize them.

24

1   Q        Okay.  Did you take any notes of your visit on

2   the 6th of April, 2004?

3   A        Just mental notes.

4   Q        Can you share those mental notes with us.

5   A        As far -- well, I had -- I remember -- I recall

6   when I showed up there that the disabled parking was

7   full and there was -- the parking lot was just totally

8   crowded and I had to park out by the street.  There was

9   like some kind of like little access aisle out by the

10  street and I was able to park there because I had my

11  van.  I was able to put my van down and get out.  While

12  my husband was loading the -- closing my van door up and

13  stuff, I proceeded across the parking lot and realized

14  that there was no access on the right front of the

15  store, and I ended up rolling behind cars.

16          I remember when I came to where I can get to

17  the sidewalk of the store there was an access aisle with

18  a disabled parking space, someone was parked in that

19  space and over in the access aisle a little bit, so when

20  I had to roll through there's a lamp post sittin' there

21  in the access aisle.  When I rolled through it was

22  really a slim, tight fit.  I was able to get through,

23  and then as I went -- rolled down the sidewalk, I went

24  up to the door, I remember noticing that there was no

25  symbol, disability symbol, and I went to open the door,

28

1    started to pull the door, had to turn my chair because

2    of the sidewalk. I didn't want to roll off the

3    sidewalk. As I pulled back, the door slipped out of my

4    hand and I started to roll back. I had to grab my chair

5    and, fortunately, at that time my husband came up behind

6    me and opened the door for me.

7         Let's see. The problems I had inside, when I

8    went in, the first thing I did was look for the ATM and

9    I wanted to take some cash out and I saw one off to the

10    left. I couldn't get to it. It was too crowded, too

11    small, too hard to get to, so I decided okay, I'll pay

12    for it at the register, proceeded through the store, had

13    difficulty getting down some of the aisles, hit my hands

14    on the -- on the merchandise, stuff on the floor, wasn't

15    able to reach things that I wanted and stuff that I

16    wanted, it was way up high.

17         I had my husband, you know, grab the stuff I

18    waited because it was too difficult to get to. As I --

19    so at that time I decided I would leave. I went up to

20    the cash register. I wasn't able to pull all the way up

21    to the register, it was crowded, had merchandise all

22    over, the register was a little high for me to look up

23    over, and couldn't reach the Paypoint or the ATM at that

24    time either, so I -- just being frustrated, I told my

25    husband just go ahead and pay for it at that time and

29

1  that's when I asked if there was a restroom.

2  Q       Is there anything else you remember from the

3  visit?

4  A       Nothing else that was --

5  Q       So your husband made the purchase for you?

6  A       Yes.

7  Q       Is that right?

8  A       Yes.

9  Q       How many parking spots were there in the

10 parking lot?

11 A       I could only guess that there's maybe ten to

12 15.

13 Q       How many were disability reserved parking

14 spots?

15 A       One that I saw.

16 Q       What type of car was parked there?

17 A       Umm, I -- the first -- when I went in there

18 there was a van parked in it.

19 Q       Can you describe the van?

20 A       No.  I don't recall what color or kind it was.

21 Q       Did it have any markings on it?

22 A       I -- I know that it had a disabled placard on

23 it because I looked for that.  Otherwise, no, I don't

24 recall.

25 Q       Do you know whether the van belonged to

                                                          30

```
1    A        No, sir.

2    Q        What were you doing at San Ysidro?

3    A        I was on a trip to visit Tijuana.

4    Q        How often do you go to San Ysidro?

5    A        Not particularly San Ysidro, but I go down to

6    San Diego and Mexico four, five, six times a -- a year.

7    Q        Is it a vacation or --

8    A        Yes.  It's a vacation.

9    Q        Did anyone reimburse you for the costs of the

10   trip you were on in April of 2004?

11   A        No, sir.

12   Q        Did you save any receipts from that trip

13   besides the 7-Eleven receipt?

14   A        It's possible, but I -- I don't know if I do.

15   I'd have to look.

16   Q        Would you look?

17   A        Yes, sir.

18            MR. TAYLOR:  For the record I'll state our

19   request to see any receipts that Ms. Jones has from that

20   trip.

21   Q        (By Mr. Taylor)  Before entering the premises

22   of 7-Eleven 17825 on April 6, 2004, were you aware of

23   any architectural barriers or impediments present in the

24   store?

25   A        No, sir.
```

34

1   at that store besides the ones that we've just

2   discussed?

3   A        The one other -- I don't know if we discussed

4   it.  One other was the -- the access from the street,

5   umm, because that's -- where I parked there was no

6   actual access to the store that was safe.

7   Q        What was the -- I'm sorry.  Continue.

8   A        There was no access that I felt was safe to get

9   to the store.  I had to roll behind vehicles.

10  Q        You had to roll behind parked vehicles?

11  A        That's correct.  Yes.

12  Q        Okay.  And did you feel that you were in danger

13  when you did that?

14  A        Yes, sir.

15  Q        Did any cars start to pull out while you were

16  doing that?

17  A        No, sir.

18  Q        Did you hit any cars with your chair as you

19  were going up?

20  A        No.

21  Q        Is there anything else you -- that you wish to

22  share that you recall about your visit on April 6, 2004,

23  to 7-Eleven No. 17825?

24  A        Not that I recall at this time.

25  Q        When was the second time that you visited

                                                        40

1  7-Eleven 17825?

2  A       Looking at this receipt, it was April 10th.

3  Q       Was that on the same trip to Tijuana?

4  A       Yes, sir.

5  Q       Were you on your way home?

6  A       Actually, what it was is I went down there

7  twice during that trip.  I went down there because we

8  walk across the border, and that just happened to be

9  another day that we went down there and, yes, I was on

10  the way back at that time.

11  Q       You say you went down there twice.  You mean

12  you went down to the 7-Eleven store twice?

13  A       I went to Tijuana twice during this trip.

14  Q       Where were you staying on this trip?

15  A       I believe it was over -- somewhere over by the

16  airport, the Harbor --

17  Q       In California?

18  A       Yes, sir.

19  Q       Okay.  When did you go home?

20  A       I believe it was the -- that was the 10th.  It

21  was -- I think it's a day after that.

22  Q       Okay.

23  A       The 11th.

24          MR. HUBBARD:  When you say "home," you mean the

25  hotel or the -- where she lives?

41

NORTHERN CALIFORNIA COURT REPORTERS
(916) 485-4949

1    wish to share about any of your visits to 7-Eleven

2    17825?

3    A        Not at this time, no.

4    Q        Are there other architectural barriers or

5    accessibility problems at 7-Eleven 17825 of which you

6    were aware at the time you filed your complaint?

7              MR. HUBBARD:  You mean other than what she's

8    told you?  That's it?

9              MR. TAYLOR:  That's right.  Other than those

10   that we've discussed today.

11             THE WITNESS:  I -- I do recall I'm going to say

12   that I noticed the -- the disabled parking sign was a

13   van sign, and when I look for a parking space, I look

14   for the separate signs so I know it's a van parking

15   space.

16             The other thing I noticed was when I was parked

17   there in October and the truck was in the way, I saw the

18   warning sign that was out on the street and I was

19   considering calling someone about the -- the truck, but

20   there was no number on that warning sign.

21   Q        (By Mr. Taylor)  Let's talk about the van sign.

22   A        Okay.

23   Q        What do you mean by "van sign"?

24   A        The disabled parking space has a disabled

25   parking sign and with it -- I noticed when -- coming in

59

1    that it said "van accessible," and when I look for a

2    sign to park or place to park in my van, I need the van

3    accessible parking space because the access aisle's

4    wider and to see it easier.  I like it when they have

5    the two different separate signs, one says "van

6    accessible" and then above it it says the disabled

7    parking symbol.

8    Q        Was there a sign that said "van accessible"?

9    A        Yes, sir.

10   Q        And it was the same sign that said "disabled

11   parking."  Is that right?

12   A        Yes.  Yes.

13   Q        Your point is that they weren't two separate

14   signs?

15   A        Correct.

16   Q        Was it on a post or was it on the wall or was

17   it affixed somewhere else?

18   A        It's on the wall.  It's a 7-Eleven building.

19   Q        Okay.  And when did you notice that about the

20   van sign?

21   A        The first -- the very first time I went there.

22   Q        Did -- that was in -- on May -- I'm sorry.

23   April 6, 2004?

24   A        That's correct.

25   Q        Did you say anything to anyone about the van

60

NORTHERN CALIFORNIA COURT REPORTERS
(916) 485-4949

```
1    A        No, sir.

2    Q        What about in July 2004?  Was it there?

3    A        Yes, sir.

4    Q        Did it have a phone number then?

5    A        I -- I don't -- I don't think so, no.

6    Q        Did you have a cell phone with you on

7    October -- on your October visit to the 7-Eleven?

8    A        I believe at that time I did.  Yes.

9    Q        It was your own cell phone?

10   A        Yes, sir.

11   Q        Did you attempt to call the police or anyone

12   else about the truck parked in the disability spot?

13   A        No, sir.  I didn't know who to call.  There was

14   no number.

15   Q        Okay.  Did you write down a license plate of

16   the truck that was there?

17   A        No, sir.

18   Q        You didn't make any other notes about the

19   truck?

20   A        No, sir.

21   Q        Besides those barriers that we've discussed

22   here already, are there other architectural barriers or

23   accessibility problems at 7-Eleven 17825 of which you

24   were aware at the time you filed your lawsuit?

25   A        I don't think so.
```

62

```
1    Q        Did you ask specifically about the barriers

2    that you encountered on April 6, 2004?

3    A        I asked him if anything had changed in there,

4    if I could reach anything.  He said, "I don't see any

5    difference."

6    Q        Did you -- so you asked him whether you could

7    reach?

8    A        I asked him if it -- they had changed anything.

9    Q        I see.  You didn't ask any more specific

10   questions than that?

11   A        No, I did not.

12   Q        Okay.  Do you have any reason to believe that

13   7-Eleven intentionally prevented you from accessing the

14   store 17825?

15   A        No, sir.

16   Q        Do you have any reason to believe that 7-Eleven

17   intends to leave in place the architectural barriers

18   that you encountered there?

19   A        I would hope not.

20   Q        But do you have any reason to --

21   A        I have no reason to believe they would leave

22   that there.  No.

23   Q        Has 7-Eleven ever stated anything to you about

24   the problems that you've discussed today at store 17825

25   that were untrue?
```

82

```
 1           MR. HUBBARD:  Wait a minute.  Wait a minute.
 2   Would you reread that question.
 3           (Record Read.)
 4           MR. HUBBARD:  I'm going to object to the form
 5   of the question.  It's compound.  She's already
 6   indicated she's never spoken with 7-Eleven --
 7           MR. TAYLOR:  You can answer.
 8           MR. HUBBARD:  -- but go ahead and answer.
 9           THE WITNESS:  Okay.  No.
10   Q       (By Mr. Taylor)  Did you suffer any physical
11   injury as a result of your visit to 7-Eleven 17825?
12   A       No, I did not.
13   Q       Did you suffer any emotional injury as a result
14   of your visit to 7-Eleven 17825?
15   A       I was a little frustrated.  I'd consider that
16   emotionally, yes.
17   Q       Besides this frustration were you emotionally
18   injured by your visits to --
19   A       I was annoyed with not being compliant, and
20   then it is frustrating, irritating to go by each time
21   and not see anything change.
22   Q       Have you sought any medical, psychiatric, or
23   psychological treatment as a result of your visits to
24   7-Eleven 17825?
25   A       No, sir.
```

83

1  Lynn Hubbard, III, SBN 69773
2  Scottlynn J Hubbard, IV, SBN 212970
3  **Law Offices of Lynn Hubbard**
   12 Williamsburg Lane
4  Chico, CA 95926
5  (530) 895-3252

6  Attorney for Plaintiff
7

**RECEIVED**

SEP 2 0 2005

CALL, JENSEN & FERRELL

8              United States District Court
9              Southern District Of California
10
11
12

13  Gypsie Jones,                    )   Case No. 04cv2186 JM (POR)
14        Plaintiff,                 )
                                     )
15        vs.                        )   **Plaintiff's Declaration for a Rule**
                                     )   **56(f) Continuance**
16                                   )
    Triple Star, Inc. dba 7-Eleven, et )
17  al.                              )
                                     )
18        Defendants.                )
19
20
21
22
23
24
25
26
27
28

*Jones v. 7-Eleven, et al.*, Case No. 04cv2186 JM (POR)
Plaintiff's Declaration for a Rule 56(f) Continuance

                    Page 1

                              **EXHIBIT B**

I, Lynn Hubbard, III, declare as follows:

1.    I am the attorney for plaintiff Gypsie Jones and have handled this action since its inception.

2.    Plaintiff's expert, Reed Settle, conducted a site inspection on June 8, 2005, to determine the architectural barriers that existed at the facility that is the subject of this action.

3.    After Reed Settle's June 8, 2005 inspection, defendants claimed to have fixed everything. *Def. Mem. of P. & A. in Support of Mot. for Summary Judgment at 2:14 - 3:15.*

4.    Plaintiff cannot respond to defendant's mootness argument without conducting a site inspection.

5.    A site inspection will allow plaintiff to develop evidence necessary to oppose defendants' mootness arguments, i.e., Mr. Settle can inspect the Store and determine whether the ADA violations he has previously identified have since been removed.

6.    Also, an inspection will allow plaintiff to determine whether other barriers have been created by the defendant's remediation efforts.  This is necessary, as defendants have been known to create barriers in their efforts to remove them.  For example, a defendant may add a curb ramp to create an accessible route of travel from a sidewalk to a store, but that curb ramp may block the aisle adjacent to the store's accessible parking space.

7.    Because plaintiff cannot address the court's ability to formulate a remedy—a threshold question for federal question jurisdiction—without a second site inspection, plaintiff requests the court either order such an inspection or deny defendants' summary judgment motion on the grounds of mootness, as untimely.

1 | 8.    I believe that the information outlined above will raise a genuine

2 | issue of material fact and, therefore, that the present motion should be

3 | denied as premature pursuant to Fed. R. Civ. Pro. 56(f).

4 | I declare under penalty of perjury that the foregoing is true and correct to

5 | the best of my ability, and if called upon to testify I would do so

6 | competently.

7 | DATED:  September 15, 2005  LAW OFFICES OF LYNN HUBBARD

8 |

9 |

10 | LYNN HUBBARD, III

11 | Attorney for Plaintiff

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

*STATE OF CALIFORNIA, COUNTY OF BUTTE*

      I, Crista Duncan, am employed in the aforesaid County; I am over the age of 18 years and not a party to the within action; my business address is 12 Williamsburg Lane, Chico, California 95926.  On September 15, 2005, I served:

  **Plaintiff's Declaration for a Rule 56(f) Continuance; Proof of Service**

on the interested parties in this action as follows:

Julie Trotter, Esq.
Call, Jensen & Ferrell
610 Newport Center Drive, Suite 700
Newport Beach, CA 92660

      The following is a procedure in which service of this document was effected:

(xx)  **U.S. Postal Service** (by placing for collection and deposit in the United States mail a copy of said document at Law Offices of Lynn Hubbard, III, 12 Williamsburg Lane, Chico, Butte County, California, in a sealed envelope, with postage fully prepaid.

(xx)  **Federal**: I declare that I am employed in the office of a member of the bar of this court, at whose direction the service was made.

      I am familiar with the practice of Law Offices of Lynn Hubbard for the collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with the ordinary course of business, the above-mentioned document would have been deposited with the United States mail, on the same day on which it was placed at Law Offices of Lynn Hubbard, for deposit.

      I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED: September 15, 2005.
                       Crista Duncan

Scott J. Ferrell, SBN 202091
Julie R. Trotter, SBN 209675
CALL, JENSEN & FERRELL
A Professional Corporation
610 Newport Center Drive, Suite 700
Newport Beach, CA 92660
(949) 717-3000
sferrell@calljensen.com
jtrotter@calljensen.com

Attorneys for Defendants TRIPLE STAR, INC. DBA 7-ELEVEN
and FIFTH STEVENSON PROPERTIES CORP.

FILED
05 SEP 21 PH 3: 16
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GYPSIE JONES,<br><br>Plaintiff,<br><br>vs.<br><br>TRIPLE STAR, INC. dba 7-ELEVEN;<br>FIFTH STEVENSON PROPERTIES<br>CORP.; and DOES 1 through 10,<br><br>Defendants. | Case No. 04 CV 2186 JM (POR)<br><br>**DEFENDANTS' OBJECTION TO PLAINTIFF GYPSIE JONES' APPLICATION FOR A RULE 56(f) CONTINUANCE**<br><br>*[Declaration of Julie R. Trotter filed concurrently herewith]*<br><br>Complaint Filed:  October 30, 2004<br>Trial Date:  January 9, 2006 |

In an apparent stall tactic, Plaintiff Gypsie Jones ("Plaintiff") has imposed upon this Court to provide her with additional time to presumably conjure up a plan of attack against Defendants Triple Star, Inc.'s and Fifth Stevenson Properties, Corp.'s (collectively, "Defendants") impending Motion for Summary Judgment ("Motion"). As set forth below, Plaintiff's dilatory tactics should not be condoned by this Court for several reasons.

**EXHIBIT C**

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

SEV02-05:166929_1:9-21-05

# I.   BACKGROUND FACTS

### A.   Plaintiff has Already Conducted Two Separate Site Inspections During The Pending Litigation

Plaintiff filed her complaint ("Complaint") on October 14, 2004.   Attached to that Complaint was a document entitled "Preliminary Site Inspection Report," which included photographs and descriptions of 15 alleged barriers at Defendants' store, located at 191 W. San Ysidro Blvd., San Ysidro, California ("Store") that allegedly "denied [Plaintiff] access to the Store, or which she seeks to remove on behalf of others under related state statutes." (Pl.'s Compl., ¶ 19).

However, contrary to the allegations in the Complaint, Plaintiff admitted at her deposition that she only encountered or had actual knowledge of a few potential barriers at the Store:  (1) no separate and additional van accessible sign; (2) no accessible route from the public sidewalk to the Store entrance; (3) one of the aisles inside the store was blocked and narrow; (4) the path to the ATM was obstructed; (5) the counter seemed too high; (6) there was a lamp post at the top of the access aisle; (7) the entrance door slipped out of her hand; (8) some items were too high for her to reach; (9) there was no telephone number on the tow-away sign; and (10) there was no public restroom. (Defendants' Separate Statement of Uncontroverted Fact No. 4 in Support of its Motion for Summary Judgment).[1]   Plaintiff had no independent knowledge of any other barriers alleged in her Complaint. (*Id.*)

Despite Plaintiff's admission that her knowledge was limited to the above barriers, Plaintiff demanded a second, full-fledged site inspection of the Store.   Despite the fact that Plaintiff does not have standing to seek relief for barriers she did not

[1] Defendants respectfully request that the Court take judicial notice pursuant to F.R.C.P. 201 of Defendants' Motion for Summary Judgment and Declaration of Julie R. Trotter in Support of Defendants' Motion for Summary Judgment, which were filed with this Court on September 8, 2005.

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

SEV02-05:166929_1:9-21-05                                    - 2 -

DEFENDANTS' OBJECTION TO PLAINTIFF'S APPLICATION FOR A RULE 56(F) CONTINUANCE

1  encounter and of which she had no knowledge at the time she filed her Complaint,

2  Defendants allowed Plaintiff to conduct an unlimited second site inspection.   The

3  second site inspection at the Store took place on or about June 8, 2005 by Plaintiff's

4  designated expert, Reed Settle.  (*Id.* at ¶ 3).  On or about August 19, 2005, Plaintiff

5  produced the Expert Report of Reed Settle based on that site inspection.  (*Id.* ¶3).  On

6  August 22, 2005, Defendants deposed Plaintiff's expert regarding the contents of his

7  Report, and on or about September 2, 2005, Defendants produced the Expert Rebuttal

8  Report of Bill Norkunas.  (*Id.* ¶¶ 5-6).

9

10      **B.      Plaintiff Has Made No Effort To Depose Defendants' Expert Since**

11              **Receipt Of His Expert Report And Has Not Requested A Site**

12              **Inspection Since Receipt of Defendants' Motion For Summary**

13              **Judgment**

14          As set forth above, Plaintiff has had a copy of Mr. Norkunas' Expert Rebuttal

15  Report ("Report") since early September – *prior to receiving Defendants' Motion for*

16  *Summary Judgment based on that Report* – but has, to date, made no effort to depose

17  Mr. Norkunas regarding the contents of the Report or the existence of any alleged

18  barriers at the Store.[2]

19

20      More importantly, Plaintiff has not requested a site inspection since receipt of

21  Mr. Norkunas' Report or Defendants' Motion for Summary Judgment.   Indeed, 14 days

22  have passed since Defendants filed their Motion, and Plaintiff still has not requested a

23  deposition or site inspection.

24

25

26  [2] In August 2005, Plaintiff made an attempt to depose Mr. Norkunas, however, at that time the parties had not engaged in

27  the exchange of expert reports. (Trotter Decl. ¶4).  As such, their attempt to depose Mr. Norkunas was improper under
    Federal Rule of Civil Procedure 26(b)((4)(A) ("If a report from the expert is required under subdivision (a)(2)(B), the

28  deposition shall not be conducted until after the report is provided.").  Since Mr. Norkunas is a rebuttal expert, Plaintiff
    should have made an effort to depose him *after* receipt of his rebuttal report. She has not.

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

DEFENDANTS' OBJECTION TO PLAINTIFF'S APPLICATION FOR A RULE 56(F) CONTINUANCE

1   **C.   Plaintiff Was Provided Photographs Showing that the Remediations**
2   **Were Made**

3   In conjunction with Defendants' Motion for Summary Judgment, Defendants
4   produced photographs of the Store that evidence the remediations that were made. (*See*
5   Declaration of Joseph Gengo filed in support of Defendants' Motion for Summary
6   Judgment). Those photographs and the accompanying Declaration of Joseph Gengo set
7   forth ADA repairs completed at the Store, including those identified by Plaintiff as
8   potential barriers to access. Moreover, Plaintiff's expert, Reed Settle was questioned
9   about the remediations at his deposition, and admitted that the remediations were
10  suitable. (*See e.g.* ¶5, Exh. A at 50:8-24; 61:4-18)

11

12  **II.   ARGUMENT**

13  **A.   Plaintiff has not Established the Prerequisites for Postponing**
14  **Summary Judgment Under FRCP 56(f)**

15  F.R.C.P. 56(f) permits a party opposing a motion for summary judgment to seek
16  deferral of a ruling pending discovery of essential facts. *See Committee for First*
17  *Amendment v. Campbell*, 962 F.2d 1517, 1521-22 (10th Cir. 1992). A motion under
18  F.R.C.P. 56(f) "is committed to the district court's sound discretion." *Adams v.*
19  *Goodyear Tire & Rubber Co.*, 184 F.R.D. 369, 373 (D. Kan. 1998) (citations omitted);
20  *see also Natural Res. Defense Council v. Houston*, 146 F.3d 1118 (9th Cir. 1998), *cert.*
21  *denied*, 526 U.S. 1111, 119 S.Ct. 1754, 143 L.Ed. 2d 786 (1999). "[I]f the party filing
22  the Rule 56(f) affidavit has been dilatory, or the information sought is irrelevant to the
23  summary judgment motion or merely cumulative, no extension will be granted." *Adams*
24  *v. Goodyear Tire & Rubber Co.*, 184 F.R.D. at 373 (citations omitted).

25

26  In addition, a party seeking a postponement of summary judgment under F.R.C.P.
27  56 *must* make the following showings before relief will be granted: (1) a description of
28  the particular discovery the movant intends to seek; (2) an explanation showing how

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

SEV02-05:166929_1:9-21-05                              - 4 -

1 that discovery would preclude entry of summary judgment; and (3) a statement as to
2 why such discovery had not been or could not have been obtained earlier. *In re Silicon*
3 *Graphics Inc. Secs. Litig.*, 183 F.3d 970 (9th Cir. 1999) (affidavits must set forth the
4 particular facts expected from discovery and specify how those facts would preclude
5 summary judgment). It is the moving party who bears the burden of demonstrating the
6 requisite basis for relief under Rule 56(f). *See Chance v. Pac-Tel Teletrac Inc.*, 242
7 F.3d 1151, 1161 n.6 (9th Cir. 2001).

8

9 Here, Plaintiff has failed to meet her burden of proving that a postponement of
10 summary judgment is necessary. *First*, Plaintiff made absolutely no showing (through
11 her counsel's one page declaration) as to how a *third* site inspection will allow Plaintiff
12 to obtain facts that preclude summary judgment. Plaintiff does not deny that the
13 barriers were removed; rather, her counsel simply speculates that Defendants' removal
14 of the alleged barriers may have created new barriers to access. However, to have
15 standing to assert a claim under the ADA, the plaintiff must, at a minimum, know of, or
16 have reason to know of, and be deterred by, the barrier *at the time the complaint is filed*
17 in order to allege an injury from that barrier. *Martinez v. Longs Drug Stores, Inc.*, 2005
18 WL 2072013 at *4 (E.D. Cal. Aug. 25, 2005). Thus, even if Plaintiff were to discover
19 such hypothetical barriers, she does not have standing to seek relief for such barriers.

20

21 *Second*, Plaintiff's dilatory requests should not be condoned by this Court.
22 Plaintiff has made no showing as to why she could not have determined whether
23 Defendants removed the barriers well prior to this request. Plaintiff has ample time to
24 seek any discovery she deems necessary to oppose the Motion, and has not
25 demonstrated why she cannot do so prior to the deadline for her opposition.

26 / / /
27 / / /
28 / / /

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

DEFENDANTS' OBJECTION TO PLAINTIFF'S APPLICATION FOR A RULE 56(F) CONTINUANCE

**B.    Plaintiff Should not be Allowed to Commence a Third Site Inspection Thirteen Months into the Case**

Yet another reason to deny Plaintiff the opportunity to conduct a third, unfettered site inspection is the abundant existence of information through other sources.  A party's right to conduct a site inspection under F.R.C.P. 34(a) is not unlimited.  Rather, "Rule 34, concerning the production of documents and tangible things as well as inspection of premises, is governed by the standards of Rule 26(b) . . . ."  *Metro Chemical, Inc. v. Lextron, Inc.*, 193 F.R.D. 667, 669 (D. Col. 2000) (*citing Belcher v. Bassett Furn. Industries, Inc.*, 588 F.2d 904, 908 (4th Cir. 1978)).  Rule 26(b) provides, in relevant part,

> [t]he frequency or extent of the use of discovery methods otherwise permitted under these rules and by any local rule shall be limited by the court if it determines that: (i) *the discovery sought is unreasonably cumulative or duplicative*, or is obtainable from some other source that is more convenient, less burdensome or less expensive.

F.R.C.P. 26(b)(2) (emphasis added).

Additionally, F.R.C.P. 26(c) authorizes the Court to exercise its discretion to limit discovery to protect a party from annoyance, embarrassment, oppression or undue burden or expense.  The Court may act upon its own initiative after reasonable notice.  F.R.C.P. 26(b)(2).  The precise purpose of Rule 26(b)(2) is to guard against redundant, disproportionate or oppressive discovery and is intended to involve the court in "curbing" discovery abuse.  *See* Schwartzer, Tashmina, Wagstaffe, *California Practice Guide: Federal Civil Procedure Before Trial*, 11:520 (The Rutter Group 2004) (citing Adv. Comm. Notes on 1993 Amendments to FRCP 26(b)(2)).

To date, Plaintiff has had (1) the opportunity to conduct two unfettered site inspections on dates of her choosing; (2) ample time to review Defendants' ADA expert report and rebuttal report; (3) ample time to depose Defendant's expert; and (4)

CALL, JENSEN & FERRELL
\ PROFESSIONAL
CORPORATION

DEFENDANTS' OBJECTION TO PLAINTIFF'S APPLICATION FOR A RULE 56(F) CONTINUANCE

1  photographs which evidence the remediation at the Store.   Clearly, the desired site

2  inspection has been made solely in order to stall the litigation and continue the

3  disruption to Defendants' business.   Plaintiff already has had two bites at the apple.

4  Given all of the avenues of discovery available to Plaintiff over the last eleven months,

5  she cannot reasonably justify the need for conducting a third over-reaching examination

6  of the Store.

7

8  **III.   CONCLUSION**

9       For the foregoing reasons, Defendants respectfully request that the Court deny

10  Plaintiff's Rule 56(f) request.

11

12  Dated:  September 21, 2005            CALL, JENSEN & FERRELL
                                         A Professional Corporation
13                                       SCOTT J. FERRELL
                                         JULIE R. TROTTER
14

15                                       By:  _Julie R. Trotter_____
16                                            Julie R. Trotter

17                                       Attorneys for Defendants TRIPLE STAR, INC.
18                                       DBA 7-ELEVEN and FIFTH STEVENSON
                                         PROPERTIES CORP.

19

20

21

22

23

24

25

26

27

28

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

SEV02-05:166929_1:9-21-05                      - 7 -

DEFENDANTS' OBJECTION TO PLAINTIFF'S APPLICATION FOR A RULE 56(F) CONTINUANCE

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 610 Newport Center Drive, Suite 700, Newport Beach, CA 92660.

On September 21, 2005, I served the foregoing document described as **DEFENDANTS' OBJECTION TO PLAINTIFF GYPSIE JONES' APPLICATION FOR A RULE 56(f) CONTINUANCE** on the following person(s) in the manner indicated:

### SEE ATTACHED SERVICE LIST

[ X ]   (BY MAIL) I am familiar with the practice of Call, Jensen & Ferrell for collection and processing of correspondence for mailing with the United States Postal Service. Correspondence so collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business. On this date, a copy of said document was placed in a sealed envelope, with postage fully prepaid, addressed as set forth herein, and such envelope was placed for collection and mailing at Call, Jensen & Ferrell, Newport Beach, California, following ordinary business practices.

[ ]   (BY FEDEX) I am familiar with the practice of Call, Jensen & Ferrell for collection and processing of correspondence for delivery by overnight courier. Correspondence so collected and processed is deposited in a box or other facility regularly maintained by FedEx that same day in the ordinary course of business. On this date, a copy of said document was placed in a sealed envelope designated by FedEx with delivery fees paid or provided for, addressed as set forth herein, and such envelope was placed for delivery by FedEx at Call, Jensen & Ferrell, Newport Beach, California, following ordinary business practices.

[ ]   (BY FACSIMILE TRANSMISSION) On this date, at the time indicated on the transmittal sheet, attached hereto, I transmitted from a facsimile transmission machine, which telephone number is (949) 717-3100, the document described above and an unsigned copy of this declaration to the person, and at the facsimile transmission telephone numbers, set forth herein. The above-described transmission was reported as complete and without error by a properly issued transmission report issued by the facsimile transmission machine upon which the said transmission was made immediately following the transmission.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on September 21, 2005, at Newport Beach, California.

Katie Dominick

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

1

## SERVICE LIST

2

Lynn Hubbard III

**Attorneys for Plaintiff**

3
Scott Lynn J Hubbard, IV
Law Office of Lynn Hubbard
4
12 Williamsburg Lane
Chico, CA 95929
5
Fax No.:  (530) 894-8244

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HALL, JENSEN &
FERRELL
PROFESSIONAL
CORPORATION



FILED

05 NOV 23 AM 8: 12

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

GYPSIE JONES,

                                    Plaintiff,

        vs.

TRIPLE STAR, INC. dba 7-ELEVEN;
FIFTH STEVENSON PROPERTIES CORP.,

                                    Defendants.

CASE NO. 04cv2186 JM(POR)

ORDER GRANTING MOTION TO
FILE AMENDED ANSWER;
GRANTING MOTION FOR RULE
56(F) CONTINUANCE

        Defendants Triple Star, Inc., dba 7-Eleven, and Fifth Stevenson Properties Corp. move for leave to file an amended answer and for summary judgment. Plaintiff Gypsie Jones opposes both motions and separately moves for a Federal Rule of Civil Procedure 56(f) continuance and for summary judgment. Defendants oppose Plaintiff's motions. Pursuant to Local Rule 7.1(d)(1), the court finds this matter appropriate for decision without oral argument. For the reasons set forth below, the motion for leave to file an amended answer is granted, the motion for a Rule 56(f) continuance is granted, and the court denies the motions for summary judgment without prejudice as prematurely filed.

## BRIEF BACKGROUND

        On October 29, 2004 Plaintiff filed a complaint for declaratory, injunctive and monetary relief. Plaintiff, a physically disabled individual within the meaning of "all

04cv2186

1    applicable California and United States laws, (Compl. ¶8), alleges that she suffered
2    discrimination when she encountered architectural barriers at Defendants' commercial
3    facility.  Attached to the complaint is a preliminary site report prepared by Plaintiff.
4    The site report alleges, among other things, that the disabled parking space is not
5    located at the shortest route of travel to the store entrance, the slope of the accessible
6    parking stall is too steep, the signage is inadequate, the counter height is too high, the
7    pubic pay telephone is not located at the appropriate height nor is there a volume
8    control, and some of the aisles in the store are less than 32 inches wide. (Compl. Exh.
9    A).

10    The focus of the motion to amend the answer centers on Plaintiff's allegation
11    that the elimination of the identified architectural barriers are "readily achievable"
12    within the meaning of the ADA. (Compl. ¶33). The answer denied this allegation but
13    failed to set forth the readily achievable requirement as an affirmative defense.
14    Defendants submit that the "readily achievable" topic was discussed at a meet and
15    confer session with Plaintiff on January 25, 2005, at the time of the Early Neutral
16    Evaluation Conference, and specifically addressed in Plaintiff's interrogatories.
17    (Trotter Decl.)  Further, on March 29, 2005 Plaintiff submitted to Defendants a
18    proposed stipulation wherein the parties would agree that barrier removal is readily
19    achievable. Defendants declined to stipulate to this fact. (Trotter Decl. Exh. G).

20    At some point in time, Plaintiff took the "position that [Defendants] are
21    precluded from raising the issue of readily achievable in regard to barrier removal,"
22    (Motion at p.6:19-20), because the readily achievable issue is an unpled affirmative
23    defense.  On June 27, Plaintiff identified Mr. Littlejohn as her expert on whether
24    removal of the barriers is readily achievable. (Trotter Decl. Exh. I). On August 18,
25    2005 Plaintiff informed Defendants that it was withdrawing Mr. Littlejohn as an expert
26    because Defendants failed to "plead readily achievable as an affirmative defense."
27    (Trotter Decl. Exh. N).

28

- 2 -

04cv2186

## DISCUSSION

**The Motion to Amend the Answer**

The threshold issue is whether "readily achievable" is an affirmative defense. Every court that has addressed the issue has concluded that Defendants bear the burden of persuasion on the affirmative defense that architectural barrier removal is not "readily available."   42 U.S.C. §§12182(b)(2)(A)(iv) and (v).   As explained in Colorado Cross Disability v. Hermanson Family, 264 F.3d 999, 1002-03 (10th Cir. 2001), under the ADA "we conclude Plaintiff must initially present evidence tending to show that the suggested method of barrier removal is readily achievable under the particular circumstances. If Plaintiff does so, Defendant then bears the ultimate burden of persuasion that barrier removal is not readily achievable under [42 U.S.C. §§12182(b)(2)(A)(iv)]." See Lentini v. Cal. Ctr. For the Arts, 370 F.3d 837, 845 (9th Cir. 2004) (under the ADA "[w]hether an accommodation fundamentally alters a service or facility is an affirmative defense"). Under the shifting burdens of production and persuasion contemplated by the ADA, the court concludes that the "readily achievable" defense must be pled as an affirmative defense pursuant to Rule 8(c). The only other issue is whether Defendants should be granted leave to amend the answer.

Under Rule 15(a), leave to amend a pleading "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). "[T]he general rule is that amendment of pleadings is to be permitted unless the opposing party makes a showing of undue delay, bad faith, undue prejudice, or futility of amendment on the part of the moving party." Saes Getters S.p.A v. Aeronex, Inc., 219 F.Supp.2d 1081, 1086 (S.D. Cal. 2002); DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir. 1987). Here, Plaintiff was on notice since January 2005 that Defendants would pursue the readily achievable defense under the ADA. Further, Plaintiff has consulted with and designated an expert on this precise issue. Accordingly, the court concludes that there is no undue delay, bad faith, or undue prejudice in granting Defendants leave to amend.

Finally, Plaintiff argues that Defendants must show good cause under Rule 16(b)

- 3 -

1   why they failed to seek leave of court to amend the answer prior to the May 1, 2005
2   deadline established in the scheduling order.  Given the limited role of pleadings in
3   federal court and the liberality of Rule 15, this argument is not persuasive. "Rule 15
4   reflects the fact that the federal rules assign the pleadings the limited role of providing
5   the parties with notice of the nature of the pleader's claim or defense and the
6   transaction, event or occurrence that has been called into question; they no longer carry
7   the burden of fact revelation and issue formulation, which is now discharged by the
8   discovery process, or control the trial phase of the action." 6 Wright & "Miller, Federal
9   Practice and Procedure § 1471 at 360 (1971). The federal rules seek to promote
10  simplicity in procedure, the just determination of litigation and the elimination of
11  unjustifiable expense and delay. See Fed.R.Civ.P. 1 (The rules "shall be construed and
12  administered to secure the just, speedy, and inexpensive determination of every
13  action."). Under the present circumstances where Plaintiff was on notice within 90
14  days of filing the complaint that Defendants would assert the "readily achievable"
15  defense, the parties discussed this defense, and Plaintiff actually prepared for this
16  defense by, among other things, designating an expert to testify regarding this defense,
17  the court concludes that an amended answer will promote the just and speedy
18  resolution of this action.

19       In sum, the motion to file an amended answer is granted. Defendants shall file
20  and serve an amended answer within 10 days of entry of this order.  The parties are
21  further instructed to meet and confer regarding any modification to the scheduling
22  order required to permit the parties to complete discovery.  The parties are also
23  instructed to contact Magistrate Judge Porter to obtain a modification to the scheduling
24  order.

25  **The Motions for Summary Judgment**

26       Both parties move for summary judgment. On the one hand, Defendants move
27  for summary judgment on the ground that all architectural barriers on the site have been
28  remedied. Defendants submit substantial evidence to support their position. However,

- 4 -

1  Plaintiff moves, pursuant to Rule 56(f), for a brief continuance in order to reinspect the

2  property to determine whether all architectural barriers have been remedied. Plaintiff's

3  counsel declares that another site inspection is required to verify that Defendants have

4  completed all remedial work.  On the other hand, Plaintiff moves for summary

5  judgment on the ground that there remains architectural barriers on the site.

6  Defendants argue that all readily achievable removal of barriers has been remedied.

7      In light of Plaintiff's request for a Rule 56(f) continuance, the court grants a

8  continuance on both motions for summary judgment.  The parties are instructed to

9  contact Magistrate Judge Porter to modify the briefing schedule in order to provide for

10 additional discovery, if required, and to recalendar the motions for summary judgment.[1]

11     In sum, the court grants Defendants leave to file an amended answer within ten

12 days of entry of this order and grants a Rule 56(f) continuance in order for Plaintiff to

13 adequately complete discovery.  Finally, the parties are instructed to contact the

14 chambers of Magistrate Judge Porter for a scheduling conference to recalendar all

15 necessary dates, including a motion for summary judgment hearing date.

16 **IT IS SO ORDERED.**

17 DATED:  _11/22_ , 2005

18

19                                    **JEFFREY T. MILLER**
                                     United States District Judge

20 cc:      All parties

21

22

23

24

25

26 —————————————————
   [1] The court notes the inconsistency in Plaintiff's position that additional discovery is required
27 while, at the same time, moving for summary judgment on the ground that there is no genuine issue
   of material fact. Notwithstanding, giving the preference for resolving claims on the merits, the better
28 practice is to permit the parties an opportunity to conduct discovery prior to moving for summary
   judgment.

                              - 5 -                              04cv2186



U.S. District Court
Southern District of California
880 Front Street, Room 4290
San Diego, CA 92101-8900

**FAX-IN-TIME.**   NOTICE:
This fax is an official communication of the
U.S. District Court for the Southern District
of California. Please be aware that these are
the only copies of these documents that you
will receive unless specifically requested.

---

To: Julie Trotter                          Date 12/23/05

From: Clerk U.S. District Court            Page 1 of 5

---

Fax queued: 12/23/05 at 09:44:40           CASE: 042186-CV #00077

CONFIDENTAL
Any questions about missing pages or unreadable copy, please call (619)
557-7667. The information contained in this facsimile message is attorney
privileged and confidential. It is intended only for the use of the
individual or entity named above. If the reader of this message is not the
intended recipient, or the employee or agent responsible to deliver it to
the intended recipient, you are hereby notified that any dissemination,
distribution or copying is strictly prohibited. If you have received this
communication in error, please call us immediately. Thank you.

IMAGES OF CASE FILINGS NOW AVAILABLE ON THE INTERNET!

Web PACER provides users with browser access to dockets and scanned images
of filed documents without leaving the comfort of their office/home.
Document copies can now be obtained more quickly and without making a trip
to the ClerkÆs Office.   Users with a PACER account can visit
http://pacer.casd.uscourts.gov/index.php via user i.d. and password for
immediate Web PACER access to the Southern District of CAÆs docket and case
filings.   Links to other courtsÆ Web PACER sites can be found at
http://pacer.psc.uscourts.gov/cgi-bin/links.pl.   An access fee of $.07 per
page viewed will be assessed.   Those interested in establishing a PACER
account can contact the PACER Service Center at (800) 676-6856 or register
on line at www.pacer.psc.uscourts.gov.

Mail & fax related issues, such as incomplete or illegible pages, should be
directed to
(619)557-7667.

**EXHIBIT E**

FILED

05 DEC 22 AM 10: 46

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY_____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GYPSIE JONES, | Civil No.   04cv2186-JM(POR) |
| Plaintiff, | **REVISED SCHEDULING ORDER REGULATING DISCOVERY AND OTHER PRETRIAL PROCEEDINGS** |
| v. | |
| TRIPLE STAR, INC., dba 7-ELEVEN; FIFTH STEVENSON PROPERTIES CORP.; and DOES 1 through 10, | |
| Defendants. | |

The Court held a telephonic Case Management Conference on December 21, 2005. Scott Hubbard appeared on behalf of Plaintiff, and Julie Trotter appeared on behalf of Defendants. Based on the order of the Honorable Jeffrey T. Miller, IT IS HEREBY ORDERED:

1.     All pending dates previously set forth in this Court's Scheduling Order Regulating Discovery and Other Pretrial Proceedings, filed April 1, 2005, shall be VACATED. The Scheduling Order is modified as follows:

2.     On or before **January 30, 2006**, all parties shall exchange with all other parties a list of all expert witnesses expected to be called at trial. The list shall include the name, address, and phone number of the expert and a brief statement identifying the subject areas as to which the expert is expected to testify. The list shall also include the normal rates the expert charges for deposition and trial testimony. On or before **February 13, 2006**, any party may supplement its designation in

- 1 -

04cv2186

1   response to any other party's designation so long as that party has not previously retained an expert
2   to testify on that subject.

3        3.      Each expert witness designated by a party shall prepare a written report to be provided
4   to all other parties no later than **February 27, 2006**, containing the information required by Federal
5   Rule of Civil Procedure 26(a)(2)(A) and (B).

6        *Except as specifically provided below, any party that fails to make these disclosures shall*
7   *not, absent substantial justification, be permitted to use evidence or testimony not disclosed at any*
8   *hearing or at the time of trial. In addition, the Court may impose sanctions as permitted by Federal*
9   *Rule of Civil Procedure 37(c).*

10       4.      Any party, through any expert designated, shall in accordance with Federal Rules of
11  Civil Procedure 26(a)(2)(C) and 26(e), supplement any of its expert reports regarding evidence
12  intended solely to contradict or rebut evidence on the same subject matter identified in an expert
13  report submitted by another party.  Any such supplemental reports are due on or before **March 13,**
14  **2006.**

15       5.      All discovery shall be completed on or before **April 3, 2006**.  *"Completed"* means
16  that all discovery under Federal Rules of Civil Procedure 30-36 must be initiated a sufficient period
17  of time in advance of the cut-off date, so *that it may be completed* by the cut-off date, taking into
18  account the times for services, notice, and response as set forth in the Federal Rules of Civil
19  Procedure.  All disputes concerning discovery shall be brought to the attention of this Court no later
20  than thirty days following the date upon which the event giving rise to the discovery dispute
21  occurred.  Counsel shall meet and confer pursuant to the requirements of Federal Rule of Civil
22  Procedure 26 and Local Rule 26.1(a) before contacting the Court regarding discovery disputes.

23       ·6.      All motions, other than motions to amend or join parties or motions in limine, shall
24  be filed **SO AS TO BE HEARD** on or before **May 15, 2006**.  Motions will not be heard or
25  calendared unless counsel for the moving party has obtained a motion hearing date from the law
26  clerk of the judge who will hear the motion.  **Be advised that the parties must file their moving**
27  **papers within three days of receiving the motion hearing date from the Court.  Be further**
28  **advised that the period of time between the date you request a motion date and the hearing**

- 2 -

1   date may be up to two months.  **Please plan accordingly.**  For example, you may need to contact

2   the judge's law clerk at least two months in advance of the motion cut-off to calendar the motion.

3   Failure of counsel to timely request a motion date may result in the motion not being heard.

4   **Motions will not be heard on the above date unless you have obtained that date in advance**

5   **from the judge's law clerk.**

6         Briefs or memoranda in support of or in opposition to any pending motion shall not exceed

7   25 pages in length without permission of the judge who will hear the motion.  No reply

8   memorandum shall exceed ten pages without leave of the judge who will hear the motion.

9         7.    The parties shall file their Memoranda of Contentions of Fact and Law in compliance

10  with Local Rule 16.1(f)(2), (3) and (4) and serve a copy on opposing counsel on or before **May 26,**

11  **2006.**

12        8.    All parties or their counsel shall comply with the Pretrial Disclosure requirements of

13  Federal Rule of Civil Procedure 26(a)(3) on or before **May 26, 2006.  Failure to comply with these**

14  **disclosures requirements could result in evidence preclusion or other sanctions under Federal**

15  **Rule of Civil Procedure 37.**

16        9.    Counsel shall meet and confer regarding the preparation of the Pretrial Order, and

17  take the action required by Local Rule 16.1(f)(4), on or before **June 2, 2006.**

18        10.    The final Pretrial Order, including objections any party has to any other parties'

19  Pretrial Disclosures shall be prepared, served on opposing parties, and lodged with the Clerk of the

20  Court on or before **June 9, 2006**, and shall be in the form prescribed in and in compliance with Local

21  Rule 16.1 (f)(7). Counsel shall also bring a copy of the final Pretrial Order for the Court to the

22  Pretrial Conference.

23        11.    The Pretrial Conference shall be held before the **Honorable Jeffrey T. Miller,** on

24  **June 16, 2006 at 8:30 a.m.**

25        12.    The trial shall commence in Judge Miller's courtroom on **July 17, 2006 at 10:00 a.m.**

26        13.    The dates and times set forth herein will not be further modified except for good

27  cause shown.

28  ///

04cv2186

1        14.     Plaintiff's counsel shall serve a copy of this order on any parties that appear in this

2 case hereafter.

3

4 DATED: _12/21/05_

5                                              LOUISA S PORTER

6                                              United States Magistrate Judge

7 cc:      The Honorable Jeffrey T. Miller
           All parties

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                       04cv2186

LYNN HUBBARD III, SBN 69773
SCOTTLYNN J HUBBARD, IV, SBN 212970
**LAW OFFICES OF LYNN HUBBARD**
12 WILLIAMSBURG LANE
CHICO, CA. 95926
(530) 895-3252

Attorneys for Plaintiff
GYPSIE JONES

**RECEIVED**

FEB 2 7 2006

*Delivered by Courier*
CALL, JENSEN & FERRELL
@ 2:36 pm *by*

THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GYPSIE JONES, <br><br> Plaintiff, <br><br> vs. <br><br> TRIPLE STAR, INC, dba 7-ELEVEN; FIFTH STEVENSON PROPERTIES CORP., et al. <br><br> Defendants. | Case No. 04CV2186 JM (POR) <br><br> PLAINTIFF'S DISCLOSURE OF EXPERT WITNESSES <br><br> **[FRCP, Rule 26(a)(2)(A) and (B)]** |

Pursuant to Federal Rules of Civil Procedure 26, Disclosure of Expert Witnesses, and the court's Revised Scheduling Order Regulating Discovery and other Pretrial Proceedings dated December 21, 2005, plaintiff hereby submits the following witnesses that she intends to have testify at trial:

///

///

Jones v. Triple Star, Inc. dba 7-Eleven, et al. Case No. 04cv2186 JM (POR)
Plaintiff's Disclosure of Expert Witnesses

Page 1

**EXHIBIT F**

**REED SETTLE**
Reed Settle Architecture
1339 Olive Street
Ramona, CA 92065
Business Phone: (760) 787-0005

**WRITTEN REPORT**

Mr. Settle's report was previously disclosed in Disclosure of Plaintiff's Expert Reed Settle dated August 18, 2005.

**BASIS FOR OPINIONS AND INFORMATION**
**CONSIDERED OR RELIED UPON**

Mr. Settle's testimony will be based on information, knowledge and experience he has obtained as a disabled rights advocate. Mr. Settle also relied on California Access Compliance Manual (Title 24), ADAAG, Manual of Uniform Traffic Control Device (MUTCD) Supplement, California Vehicle Code. Also see Mr. Settle's curriculum vitae attached to Disclosure of Plaintiff's Expert Reed Settle dated August 18, 2005.

**QUALIFICATIONS OF EXPERT**

Mr. Settle's curriculum vitae was previously disclosed on August 18, 2005, as Exhibit "B" to Disclosure of Plaintiff's Expert Reed Settle.

**PUBLICATIONS AUTHORED WITHIN THE PRECEDING TEN**
**YEARS**

Mr. Settle has not authored any publications within the preceding ten years.

///

///

Jones v. Triple Star, Inc. dba 7-Eleven, et al. Case No. 04cv2186 JM (POR)
Plaintiff's Disclosure of Expert Witnesses
Page 2

## COMPENSATION FOR SERVICES

Mr. Settle's customary hourly fee for depositions, daily rate for court testimony and hourly fee for non-testimony time is $250.00 an hour.

## PRIOR TESTIMONY AT TRIAL OR DEPOSITION
## IN THE PRECEDING FOUR YEARS

### (Trial Testimony)

1.    Hubbard v. Rite Aid, 02cv2497 WQH BLM

### (Deposition Testimony)

1.    Harris v Costco, 04cv0409 L (WMC)

2.    Jones v Henry's, 04cv1018 WQH (WMc)

3.    Doran v. Del Taco, SACV04-0046 CJC (ANx)

4.    Jones v. 7-11, 04cv2186 JM (POR)

### HAROLD LITTLEJOHN
1208 Mangrove Avenue
Chico, CA 95926
Business Phone: (530) 895-3353

### WRITTEN REPORT

Attached as exhibit "A" is a true and accurate copy of Mr. Littlejohn's report.

///
///
///
///

Jones v. Triple Star, Inc. dba 7-Eleven, et al. Case No. 04cv2186 JM (POR)
Plaintiff's Disclosure of Expert Witnesses
Page 3

# BASIS FOR OPINIONS AND INFORMATION
# CONSIDERED OR RELIED UPON

Mr. Littlejohn's testimony will be based on information, knowledge and experience he has obtained as a CPA with 20 years experience. Mr. Littlejohn also has a law degree and bases his opinion upon that legal knowledge.

# QUALIFICATIONS OF EXPERT

Exhibit "B" is a true and accurate copy of Mr. Littlejohn's resume.

# PUBLICATIONS AUTHORED WITHIN THE PRECEDING TEN
# (10) YEARS

Mr. Littlejohn has not authored any publications within the preceding ten years.

# COMPENSATION FOR SERVICES

Mr. Littlejohn's customary hourly fee for depositions, daily rate for court testimony and hourly fee for non-testimony time is $300.00 an hour.

# PRIOR TESTIMONY AT TRIAL OR DEPOSITION
# IN THE PRECEDING FOUR YEARS

**(Trial Testimony)**

1.   **Hubbard v. Rite Aid, 02cv2497 WQH BLM**

**(Deposition Testimony)**

1.   **Sanford v. Rite Aid, et al., CIV.S.02-0480 MCE JFM**

2.   **Bates v. Rite Aid, et al., CIV.S.02-1487 LKK DAD**

Jones v. Triple Star, Inc. dba 7-Eleven, et al. Case No. 04cv2186 JM (POR)
Plaintiff's Disclosure of Expert Witnesses
Page 4

3.     __Feezor v. 7-Eleven, 04cv1954 JAH (NLS)__

4.     __Doran v. Del Taco, SACV 04-0046 CJC (ANx)__


DATED:  February 27, 2006      LAW OFFICES OF LYNN HUBBARD

By:

LYNN HUBBARD, III
Attorney for Plaintiff GYPSIE JONES

Jones v. Triple Star, Inc. dba 7-Eleven, et al. Case No. 04cv2186 JM (POR)
Plaintiff's Disclosure of Expert Witnesses

Page 5

1    <u>PROOF OF SERVICE</u>

2    STATE OF CALIFORNIA, COUNTY OF BUTTE

3        I, Stacy O'Dell, am employed in the aforesaid County; I am over the age of 18
     years and not a party to the within action; my business address is 12 Williamsburg Lane,
4    Chico, Butte County, California 95926.
         On February 27, 2006, I served the document(s) described as:
5
6        **PLAINTIFF'S DISCLOSURE OF EXPERT WITNESSES**

7    on the interested parties in this action as follows:

8        Julie Trotter, Esq.
         **CALL JENSEN & FERRELL**
9        610 Newport Center Drive, Suite 700
         Newport Beach, CA 92660
10       Attorney for Defendants Triple-Star, Inc. dba 7-Eleven
         and Fifth Stevenson Properties Corp.
11
         The following is a procedure in which service of this document was effected:
12
13   (  )   U.S. POSTAL SERVICE - by placing for collection and deposit in the United
14           States mail a copy of said document at Law Offices of Lynn Hubbard, 12
             Williamsburg Lane, Chico, Butte County, California, in a sealed envelope, with
15           postage fully prepaid. I am familiar with the practice of Law Offices of Lynn
16           Hubbard for the collection and processing of correspondence for mailing with
             the United States Postal Service. In accordance with the ordinary course of
17           business, the above-mentioned document would have been deposited with the
18           United States mail, on the same day on which it was placed at Law Offices of
             Lynn Hubbard for deposit.
19   (  )   OVERNIGHT DELIVERY - by causing said envelope(s) to be delivered
20           overnight via an overnight delivery service in lieu of delivery by mail to the
21           addressee(s).
     (XX)  PERSONAL SERVICE - by causing to be delivered such document by hand to
22           the offices of the addressee(s).
23
     (XX)  Federal: I declare that I am employed in the office of a member of the bar of
24           this court, at whose direction the service was made.
25
26       I declare under penalty of perjury under the laws of the State of California that
     the foregoing is true and correct.
27
28   DATED: February 27, 2006
                                               Stacy O'Dell

FEB-27-2006 13:06 FROM:LAW OFFICE L HUBBARD 530 894 8244        TO: 94801217        P.8/51

# Exhibit A

# Harold Littlejohn, CPA, JD
## 1208 Mangrove Avenue
## Chico, California  95926
## 530-895-3353

December 12, 2005

Re: Jones v 7-Eleven, Inc

The following details why I in my expert opinion feel that ADA-required barrier removals in the amount of $26,545 are readily achievable by 7-Eleven, Inc, 191 San Ysidro Blvd., San Ysidro, California at this time.  The following analysis refers to the amounts from the news release of 7-Eleven, Inc of 10/25/05 referring to the 2005 3rd quarter ended 9/30/05, (the current quarter,) with the previous period referred to being the quarter ended 9/30/04. Individual store information is from the "Store Data" spreadsheet headed "17825-2005."  All numbers mentioned are US dollars.

## OVERVIEW

7-Eleven, Inc,  is the world's largest operator, franchisor, and licensor of convenience stores with approximately 29,000 stores worldwide.

On 11/9/05, 7-Eleven, Inc became a private company when all of its common shares were purchased.  Its stock is no longer traded publicly, per the company's website.

## EARNINGS (INCOME STATEMENT)

7-Eleven had an increase in total revenue for the current quarter over the previous year of 550 million dollars or a 17.2% increase, to 3.8 billion from 3.243 billion during third quarter 2004.  Net earnings also increased, from 44.2 million to 68.3 million, an increase of over 54%.

Revenue and net earnings are both significantly better than the previous year, indicating an improvement in operations and a company doing better in the current year than the previous year, and

realizing a substantial net profit.

## CAPITAL EXPENDITURES

The company states in its news release article that capital expenditures for the current quarter were 75.2 million. They operate, franchise or license approximately 29,000 stores. 75.2 million divided by 29,000 equals an average of 2,593 per store per quarter, annualized (x4) would result in an average of 10,372 spent per store per year, capital expenditures encompassing the type of improvements mandated by the ADA at this San Ysidro store. This demonstrates that 26,545 on one store is not extremely out of line for an upgrade amount spent on one store. Also their news release states that the company plans to spend 390-430 million in the year of 2005 on capital improvements, indicating their commitment to large improvements.

## STORE 17825 INCOME STATEMENT

The San Ysidro store's income statement for seven months ended 7/31/05 shows steady monthly net profits and a year-to-date net income before taxes of 125,895, or an average of 17,985 per month, indicating healthy profit and cash flow and the ability to spend 26,545 on needed improvements, borrowing at current market rates if necessary.

## CONCLUSION

7-Eleven, Inc is a major convenience store operator with approximately 29,000 stores worldwide. They plan on spending 390 to 430 million in the fiscal year ending 12/31/05 on property and equipment, including new stores, which indicates their ability to build and improve property. The barrier removal cost in order to comply with the ADA of $26,545 is well within their financial ability and the ability of the San Ysidro store by itself, therefore in my opinion these mandated improvements are readily achievable, i.e., easily accomplishable and able to be carried out without much difficulty and expense. I see nothing in the financial information that this report is based on that would indicate any other conclusion.

*Under penalty of perjury, I declare that that to the best of my knowledge the above is true, correct, and complete.*

Sincerely,

Harold Littlejohn                                      12/12/05

0 • *

Reed Settle
8/16/05          0 • *G

```
              250 • 00 +
           19,381 • 00 +
              150 • 00 +
              628 • 00 +
              573 • 00 +
              125 • 00 +
              750 • 00 +
              750 • 00 +
Low-high  ⎧   750 • 00 + I
          ⎩   750 • 00 + I
              250 • 00 +
               50 • 00 +
              895 • 00 +
               67 • 00 +
              488 • 00 +
              488 • 00 +
              100 • 00 +
              100 • 00 +

           25,045 • 00 *

            1,500 • 00 * I

Low end   25,045 • 00 +
        ⟨  1,500 • 00 + ⟩
high end  26,545 • 00 *

               0 • *
```

·Home » Investors



> PRODUCTS & SERVICES   › CAREERS   › FRANCHISING   › NEWS ROOM   › INVESTORS    Search

› About 7-Eleven   › Contact Us   › Store Locator   › Site Index   › Lottery Resul

## *Investors*

On November 9, 2005, Seven-Eleven Japan Co., Ltd., a company organized under the laws of Japan, announced that through its wholly owned subsidiary, IYG Holding Company, a Delaware corporation, it had completed its tender offer to purchase all of the issued and outstanding common stock of 7-Eleven, Inc. that it did not already own. As a result, 7-Eleven, Inc.'s common stock will no longer be publicly traded, on the New York Stock Exchange or otherwise. Thank you for your interest in 7-Eleven.

Products & Services | Careers | Franchising | News Room
About 7-Eleven | Contact Us | Store Locator | Site Index | Lottery Results

Copyright © 7-Eleven, Inc. 2005. All rights reserved.
This site is intended for residents of the US and Canada, excluding Quebec.
Privacy Policy | Terms & Conditions | 7-Eleven in Canada

Case 3:04-cv-02186-JM-POR Document 82 Filed 03/17/06 PageID.1365 Page 61 of 136
FEB-27-2006 13:07 FROM:LAW OFF L HUBBARD 538 894 8244 TO 94801217 P.14/51
7-Eleven: News Room - Ne elease Article Page 1 of 4

Home » News Room » News Release Archive » News Release Article



**PRODUCTS & SERVICES** ▸ **CAREERS** ▸ **FRANCHISING** ▸ **NEWS ROOM** ▸ **INVESTORS**

▸ About 7-Eleven ▸ Contact Us ▸ Store Locator ▸ Site Index ▸ Lottery Resul

Search

## News Room

▸ News Room Home
▸ News Release Archive
▸ Background Information
▸ Fun Facts and Trivia

### News Release Article
Back to News Release Archive

**7-Eleven, Inc. Announces Results for 2005 Third Quarter; Merchandise Sales Increase 6.7%; Company Raises 2005 Core Earnings Guidance**

**Dallas, TX, October 25, 2005 -**

Third Quarter 2005 Highlights:

- Grew core earnings by 53.3 percent to $66.3 million, or $0.52 per diluted share, compared to $43.2 million, or $0.35 per diluted share, in third quarter 2004
- Increased total revenue $556.3 million, or 17.2 percent, to $3.8 billion
- Increased total merchandise sales by $142.4 million, or 6.7 percent, to $2.3 billion
- Produced a 4.9 percent increase in U.S. same-store merchandise sales, on top of a 4.2 percent increase in third quarter 2004
- Improved merchandise gross profit 6.5 percent to $817.0 million
- Achieved record quarterly gasoline gross profit of $120.8 million with a gasoline margin of 20.8 cents per gallon
- Reached global 7-Eleven store count of approximately 29,000 stores
- Raising 2005 core earnings guidance to a range of $1.30 to $1.33 per diluted share from previous guidance of $1.12 to $1.16 per diluted share

7-Eleven, Inc. (NYSE: SE), today reported that core earnings, which exclude non-operating items, grew 53.3 percent to $66.3 million, or $0.52 per diluted share, for the quarter ended September 30, 2005. This compares to core earnings of $43.2 million, or $0.35 per diluted share, for the third quarter of 2004. Net earnings for the third quarter of 2005 were $68.3 million, or $0.53 per diluted share, compared to $44.2 million, or $0.36 per diluted share a year ago.

| Earnings Summary (Unaudited) ($ in millions) | | |
|---|---|---|
| | Three Months Ended September 30, | |
| | 2004 Restated[1] | 2005 |
| Net Earnings | $44.2 | $68.3 |
| Adjustments (Net of Tax): | | |
| Non Operating Items: | | |
| ▸ Currency Conversion Gain | (1.1) | (1.5) |

Peek a produ classi

| | | |
|---|---|---|
| Gain Amortization on Sale of Cityplace and Other Items | (0.9) | (0.4) |
| Loss (Gain) from Discontinued Operations | 1.0 | (0.1) |
| Core Earnings | $43.2 | $66.3 |

[1] . In December 2004, 7-Eleven revised its accounting for depreciation of leasehold improvements and restated prior years to adjust the amortization expense of certain of its leasehold improvements to the shorter of the economic useful life or the lease term as defined by SFAS No. 13, "Accounting For Leases." Prior years were restated to be consistent with the revised accounting for depreciation of leasehold improvements.

**Review of Third Quarter 2005 Core Earnings**
Total revenue for the third quarter was $3.8 billion, an increase of 17.2 percent. This increase was driven by a 37.5 percent increase in gasoline revenue and a 6.7 percent increase in merchandise sales. Total merchandise sales increased to $2.3 billion, driven by a 4.9 percent increase in U.S. same-store merchandise sales. Categories that contributed to the merchandise sales increase for the quarter included fresh food, hot and cold beverages, cigarettes and services.

"7-Eleven's ability to adapt to changing consumer needs has contributed to 36 consecutive quarters of increased U.S. same-store merchandise sales," said Jim Keyes, 7-Eleven, Inc.'s president and chief executive officer. "This sustained merchandise sales record demonstrates the effectiveness of our Retailer Initiative merchandising strategy," Keyes said.

For the third quarter, merchandise gross profit grew 6.5 percent to $817.0 million. Merchandise gross profit margin decreased by 8 basis points to 36.15 percent compared to the prior-year quarter. This decrease was primarily due to changes in mix.

Total gasoline gallons sold for the third quarter rose to 582.0 million, with average gallons sold per store growing 0.9 percent. Gasoline gross profit was a record $120.8 million, an increase of 46.3 percent over the third quarter of 2004. Expressed as cents-per-gallon, the company earned a gasoline margin of 20.8 cents in the third quarter of 2005, versus 14.4 cents in the same quarter a year ago. "During a period of extreme volatility in wholesale gasoline costs, we produced gallon growth as well as record gasoline gross profit and cent-per-gallon margins by proactively managing our retail prices throughout our system," Keyes said.

Operating, selling, general and administrative (OSG&A) expenses rose 6.5 percent to $844.3 million in the third quarter of 2005. Expressed as a percent of total revenue, OSG&A was 22.2 percent, compared to 24.5 percent in the prior-year third quarter. After normalizing for the higher gasoline revenue due to the 68 cent-per-gallon increase in gasoline retail prices year over year, OSG&A for the third quarter of 2005 as a percent of total revenue would have been 24.8 percent compared to 24.5 percent for the prior-year quarter.

**Summary of Third Quarter 2005 Non-Operating Items**
The company reported an after-tax, non-cash currency conversion gain
of $1.5 million for the third quarter of 2005.

During the second quarter of 2004, the company completed the sale of
its headquarters which resulted in a deferred gain that is being
recognized over three years. Third quarter 2005 results include an after-
tax gain of approximately $0.9 million related to the amortization of the
deferred gain.

The company closed nine stores during the third quarter of 2005, and
reclassified the prior periods for the after-tax results of stores closed
during the third quarter to Discontinued Operations.

**Capital Expenditures**
During the third quarter of 2005, 7-Eleven invested approximately $75.2
million in capital expenditures. The company anticipates that capital
expenditures for 2005 will be in the range of $390 to $430 million, and
expects to open around 90 to 95 stores during 2005.

**7-Eleven Stores**
As of September 30, 2005, the company and its franchisees operated
5,818 stores in the United States and Canada, with the global
7-ELEVEN® store count reaching 28,993 stores.

Review Financials here

**2005 Outlook**
The company is raising its core earnings guidance for 2005 to a range of
$1.30 to $1.33 per diluted share. This compares to previous core
earnings guidance of $1.12 to $1.16 per diluted share. The increase in
core earnings guidance is due to unusually high gasoline cent-per-gallon
margins in September and October. Current gasoline margins have
significantly increased in a particularly volatile gasoline market.
Management expects market conditions to stabilize during the quarter
and the company's gasoline margins to return to historical levels of 13
to 15 cents per gallon over the long term.

**Core Earnings Guidance**
The company believes that core earnings, which exclude non-operating
items, are more indicative of the company's operating performance than
net earnings. Certain items that impact net earnings, such as a gain or
loss on foreign currency conversion, are difficult to forecast. Therefore,
the company provides guidance based on core earnings.

**U.S. Same-Store Merchandise Sales Calculation**
When determining the same-store merchandise sales calculation, the
company includes the merchandise sales of both its U.S. company-
owned and franchise-operated stores if they were operating for all days
of the periods being compared. New stores, relocated stores or rebuilt
stores are not included in the same-store sales calculation until they
have recorded merchandise sales for all days of the periods being
compared.

**Tender Offer**
7-Eleven is the subject of an unsolicited tender offer commenced by
Seven-Eleven Japan Co., Ltd. 7-Eleven has established a special
committee of independent directors to review the tender offer. The
special committee recommends that 7-Eleven shareholders read the

Case 3:04-cv-02186-JM-POR  Document 82  Filed 03/17/06  PageID.1368  Page 64 of 136
FEB-27-2006 13:08 FROM:LAW OFF   L HUBBARD 530 894 8244          TO:   94801217      P.17/51
7-Eleven: News Room - Ne   release Article                                    Page 4 of 4

- special committee's solicitation/recommendation statement, as amended, regarding the tender offer. Shareholders may obtain a free copy of the solicitation/recommendation statement, which has been filed by 7-Eleven with the Securities and Exchange Commission, at the SEC's Web site at www.sec.gov.

**About 7-Eleven, Inc.**

7 Eleven, Inc. is the premier name and largest chain in the convenience retailing industry. Headquartered in Dallas, Texas, 7-Eleven, Inc. operates or franchises approximately 5,800 7-Eleven® stores in the United States and Canada and licenses approximately 23,200 7-Eleven stores in 17 countries and U.S. territories throughout the world. During 2004, 7-Eleven stores worldwide generated total sales of approximately $41 billion. Find out more online at www.7-Eleven.com.

*This release includes certain statements that are considered "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Any statement that is not a statement of historical fact should be deemed to be a forward-looking statement. Because these forward-looking statements involve risks and uncertainties, actual results may differ materially from those expressed or implied by these forward-looking statements. There can be no assurance that (i) we have correctly measured or identified all of the factors affecting our business or the extent of their likely impact; (ii) the publicly available information with respect to those factors on which our business analysis is based is complete or accurate; (iii) our analysis is correct; or (iv) our strategy, which is based in part on this analysis, will be successful. Additional information about these risks and uncertainties and other matters can be found in the company's annual report on Form 10-K for the year ended Dec.31, 2004, and in its periodic reports on Form 10-Q and current reports on Form 8-K.*

Carole Davidson, CFA
Vice President, IR
7-Eleven, Inc.
214.828.7021

Margaret Chabris
Media Relations
7-Eleven, Inc.
214.828.7345

Products & Services | Careers | Franchising | News Room
About 7-Eleven | Contact Us | Store Locator | Site Index | Lottery Results

Copyright © 7-Eleven, Inc. 2005. All rights reserved.
This site is intended for residents of the US and Canada, excluding Quebec.
Privacy Policy | Terms & Conditions | 7-Eleven in Canada

17825 - 2005

| LINE DESC | JAN | FEB | MAR | APR | MAY | JUN | JUL | YTD 2005 | YTD 2004 | VARIANCE | % CHANGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **STORE DATA** | | | | | | | | | | | |
| FRANCHISE OPERATED MDSE STORES | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 7.00 | 7.00 | | 0.00% |
| COMPANY OPERATED MDSE STORES | | | | | | | | | | | |
| NUMBER OF MDSE STORE MONTHS | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 7.00 | 7.00 | | 0.00% |
| FRANCHISE OPERATED MDSE DAYS | 31.00 | 28.00 | 31.00 | 30.00 | 31.00 | 30.00 | 31.00 | 212.00 | 212.00 | 1.00 | 0.47% |
| COMPANY OPERATED MDSE DAYS | | | | | | | | | | | |
| NUMBER OF MDSE STORE DAYS | 31.00 | 28.00 | 31.00 | 30.00 | 31.00 | 30.00 | 31.00 | 212.00 | 212.00 | 1.00 | 0.47% |
| | | | | | | | | | | | |
| **NET SALES** | | | | | | | | | | | |
| **MERCHANDISE** | | | | | | | | | | | |
| FRANCHISE MDSE PRODUCT SALES | 142,164.80 | 137,377.95 | 152,291.70 | 147,571.74 | 147,065.21 | 137,794.67 | 149,847.88 | 1,014,262.90 | 1,238,864.31 | (224,580.42) | -18.13% |
| CORPORATE MDSE PRODUCT SALES | | | | | | | | | | | |
| FRANCHISE COMMISSIONS/FEES | 5,311.41 | 4,260.11 | 4,853.82 | 5,106.25 | 5,013.00 | 4,773.63 | 4,861.62 | 34,361.90 | 33,172.11 | 1,189.79 | 3.59% |
| CORPORATE COMMISSIONS/FEES | | | | | | | | | | | |
| TOTAL MERCHANDISE SALES | 147,476.21 | 142,338.00 | 157,157.96 | 152,677.99 | 152,078.21 | 142,528.30 | 154,589.50 | 1,048,645.70 | 1,272,036.42 | (223,390.63) | -17.88% |
| | | | | | | | | | | | |
| TOTAL NET SALES | 147,476.21 | 142,338.00 | 157,157.96 | 152,677.99 | 152,078.21 | 142,528.30 | 154,589.50 | 1,048,645.70 | 1,272,036.42 | (223,390.63) | -17.88% |
| | | | | | | | | | | | |
| **MERCHANDISE GROSS PROFIT** | | | | | | | | | | | |
| **FRANCHISE** | | | | | | | | | | | |
| FRANCHISE MDSE PRODUCTS GP | 42,732.63 | 42,412.93 | 47,790.94 | 44,213.19 | 46,660.11 | 43,026.10 | 47,726.22 | 313,610.33 | 388,061.34 | (41,461.00) | -11.98% |
| FRANCHISE COMMISSIONS/FEES GP | 5,311.41 | 4,260.11 | 4,853.86 | 5,106.25 | 5,013.00 | 4,773.63 | 4,861.62 | 34,361.90 | 33,172.11 | 1,189.79 | 3.59% |
| FRANCHISE GP WRITE-OFFS | (631.96) | (671.95) | (840.90) | (741.67) | (561.89) | (665.78) | (727.99) | (4,901.54) | (4,833.21) | (68.43) | 0.84% |
| FRANCHISE GP SHORTAGES | | | | | | | | | | | |
| TOTAL FRANCHISE MDSE GP | 47,412.28 | 48,001.09 | 51,906.14 | 48,578.77 | 49,901.22 | 47,126.95 | 51,963.15 | 342,960.98 | 383,298.29 | (40,337.31) | -10.52% |
| | | | | | | | | | | | |
| TOTAL MERCHANDISE GROSS PROFIT | 47,386.95 | 48,001.09 | 51,931.42 | 48,576.77 | 49,901.22 | 47,126.95 | 51,943.15 | 342,960.98 | 383,298.29 | (40,337.31) | -10.52% |
| | | | | | | | | | | | |
| TOTAL GROSS PROFIT | 47,386.95 | 48,001.09 | 51,931.45 | 48,578.77 | 49,901.22 | 47,126.95 | 51,943.15 | 342,960.98 | 383,298.29 | (40,337.31) | -10.52% |
| | | | | | | | | | | | |
| MISCELLANEOUS OTHER INCOME | 11.82 | 11.82 | 11.82 | 11.82 | 11.82 | 11.82 | 11.82 | 82.74 | 82.74 | | 0.00% |
| TOTAL OTHER INCOME | 11.82 | 11.82 | 11.82 | 11.82 | 11.82 | 11.82 | 11.82 | 82.74 | 82.74 | | 0.00% |
| | | | | | | | | | | | |
| **SELLING EXPENSES** | | | | | | | | | | | |
| **COMPENSATION & TAXES & OTHER-** | | | | | | | | | | | |
| **SELLING** | | | | | | | | | | | |
| STORE STAFF LABOR | | | | | | | | | | | |
| STORE STAFF LABOR - OVERTIME | | | | | | | | | | | |
| STORE MANAGER LABOR | (28.30) | (26.20) | | | | | | (94.50) | (147.44) | (52.94) | 62.97% |
| STORE VACATION PAY - SELLING | (1.13) | (0.82) | | | | | | (1.95) | (1.36) | 0.59 | -43.38% |
| STORE TRAINING & OTHER LABOR | (3.13) | 0.33 | | | | | | (2.80) | (61.46) | (58.50) | 99.44% |
| TOTAL COMPENSATION - SELLING | (32.63) | (26.69) | | | | | | (59.34) | (210.28) | (150.94) | 71.79% |
| PAYROLL TAXES - SELLING | (4.75) | (2.72) | | | | | | (7.47) | (17.60) | (10.13) | 57.56% |
| PROFIT SHARING EXP - SELLING | | | | | | | | | | | |
| GROUP INSURANCE - SELLING | | | | | | | | | | | |
| WORKERS COMP & OTHER - SELLING | (4.23) | (3.90) | | | | | | (8.12) | (16.00) | (7.93) | 49.47% |
| TOTAL COMP & TAXES & OTHER - | (41.63) | (33.31) | | | | | | (74.94) | (243.97) | (169.03) | 69.28% |
| SELLING | | | | | | | | | | | |
| | | | | | | | | | | | |
| **ALL OTHER SELLING** | | | | | | | | | | | |
| ADVERTISING | (135.29) | (133.47) | (32.79) | (36.14) | (94.17) | (97.41) | (282.07) | (901.46) | (3,187.48) | (2,366.02) | 74.70% |
| CREDIT CARD PROCESSING EXPS | (242.47) | (90.98) | (394.28) | (322.52) | (135.28) | (160.22) | (518.98) | (1,873.34) | (1,653.31) | 220.03 | -13.31% |
| STORE SUPPLIES | (33.12) | (78.94) | (20.37) | | (13.99) | (25.53) | (0.57) | (132.52) | (111.71) | 20.81 | -18.63% |
| BAD DEBT | (0.02) | | | | | (71.07) | (2.01) | (71.11) | (1.12) | 69.98 | -6182.92% |
| ENVIRONMENTAL | | | | | | | | | | | |
| LICENSES & PERMITS | | | | | (1.51) | (20.00) | | (21.51) | (0.15) | 21.36 | -14340.00% |
| CASH SHORTAGES | | | | | | | | | | | |
| LOTTERY SHORTAGES | | | | | | | | | | | |
| GUARD & SECURITY | | | | | | | | | | | |
| LAUNDRY & UNIFORMS | | | | | | | | | | | |
| VCOM & ATM CASH MGMT EXPS | | | | | | | | | | | |
| MISCELLANEOUS SELLING | (10.12) | (11.82) | 0.73 | (8.94) | 12.10 | (29.94) | (48.21) | (106.84) | (150.00) | (52.36) | 32.85% |
| TOTAL ALL OTHER SELLING | (421.14) | (316.02) | (446.71) | (369.12) | (231.34) | (383.79) | (884.44) | (3,006.58) | (5,092.76) | (2,086.10) | 40.98% |
| TOTAL SELLING EXPENSES | (462.77) | (348.32) | (446.71) | (369.12) | (231.34) | (383.79) | (884.44) | (3,081.50) | (5,336.73) | (2,253.23) | 42.89% |
| | | | | | | | | | | | |
| **G&A EXPENSES** | | | | | | | | | | | |
| MISCELLANEOUS G&A | | | | | | | | | | | |
| INCOME/(EXPENSE) | | | | | | | | | 1,050.00 | 1,050.00 | | 100.00% |
| TOTAL ALL OTHER G&A | | | | | | | | | 1,050.00 | 1,050.00 | | 100.00% |
| TOTAL G&A EXPENSES | | | | | | | | | 1,050.00 | 1,050.00 | | 100.00% |
| | | | | | | | | | | | |
| **OCCUPANCY AND RELATED** | | | | | | | | | | | |
| **EXPENSES** | | | | | | | | | | | |
| RENT | (51.67) | (51.67) | (45.26) | (45.26) | (45.26) | (45.26) | (45.26) | (329.64) | (766.53) | (436.89) | 57.00% |
| PROP & EQUIP DEPRECIATION & | (1,763.67) | (1,753.67) | (1,754.26) | (1,753.33) | (1,743.00) | (1,866.42) | (1,689.22) | (12,123.57) | (13,079.90) | (956.33) | 7.31% |
| AMORT | | | | | | | | | | | |
| UTILITIES | (1,350.65) | (2,949.57) | (2,585.22) | (3,051.66) | (2,864.80) | (2,957.13) | (3,118.31) | (14,977.33) | (19,664.02) | 2,323.33 | -13.86% |
| TELEPHONE/COMMUNICATION LINES | (286.00) | (295.24) | (289.00) | (296.00) | (289.00) | (296.00) | (296.00) | (2,047.24) | (1,940.90) | 106.44 | -4.49% |
| REPAIRS & MAINTENANCE | (241.76) | (646.02) | (114.63) | (125.28) | (270.07) | (690.91) | (119.61) | (2,410.90) | (3,906.06) | (1,497.10) | 36.31% |
| PROPERTY TAXES | (532.50) | (572.50) | (572.50) | (572.50) | (612.50) | (348.37) | (562.50) | (3,833.37) | (4,028.51) | (185.14) | 4.66% |
| INSURANCE/CRIME & CASUALTY | (366.36) | (430.71) | (430.71) | (380.72) | (386.36) | (360.72) | (372.00) | (2,727.56) | (2,521.62) | 205.95 | -8.17% |
| NON-CAPITALIZABLE EQUIPMENT | (10.63) | (9.40) | (22.40) | (11.62) | (27.30) | (14.20) | (35.10) | (130.91) | (73.00) | 57.91 | -67.00% |
| GAIN/(LOSS) ON PROP & EQUIP | | | | | | | | | (133.15) | (133.15) | 100.00% |
| SUBLEASE RENTAL INCOME | | | | | | | | | | | |

SEV0205-00313

## REED SETTLE
A    R    C    H    I    T    E    C    T    U    R    E

1339 Olive Street
Ramona, CA 92065
Voice 760.787.0005
FAX 760.787.5952
rsettle@cox.net



**CASE:**

**JONES v 7-Eleven**

191 W. San Ysidro Blvd, San Ysidro, CA

# Inspection of Facility for Conformance with the Americans with Disabilities Act

## PREPARED FOR:

### LAW OFFICES OF LYNN HUBBARD
12 Williamsburg Lane
Chico CA, 95926

**RSA Proj No:**
**2510**

8/16/2005

**REED SETTLE**

A   R   C   H   I   T   E   C   T   U   R   E

1339 Olive Street
Ramona, CA 92065
Voice 760 787 0005
FAX 760 787.5952
rsettle@cox.net

LAW OFFICES OF LYNN HUBBARD
12 Williamsburg Lane
Chico CA, 95926

Re:   Jones v 7-Eleven
      191 W. San Ysidro Blvd.
      San Ysidro, CA
      RSA Project Number: 2510

Dear Mr. Hubbard,

Enclosed are my findings for the preliminary inspection conducted June 8, 2005, of the above referenced facility for conformance with the Americans with Disabilities Act.

The report notes instances where existing conditions do not meet the current California Title 24 or Federal ADAAG requirements.

This facility is required by state and federal laws to be made accessible when undergoing new and remodeling construction. This facility must also meet requirements of Title III of the ADA regarding readily achievable barrier removal and maintenance of accessibility features in this facility.

The non-complying accessibility issues at this facility generally fall into the following categories:

1. Site Entrance Signage
2. Path of Travel.
3. Parking.
4. Doors
5. Public Telephones
6. Counter
7. Signs and Identification

Thank you for the opportunity to provide Expert Witness Architectural Services to your firm. Please contact me with any questions regarding this report.

Sincerely,

Reed W. Settle / Architect
N.C.A.R.B

Jones v 7-Eleven; 191 W. San Ysidro Blvd, San Ysidro, CA

Page 3 of 10

| Item | Location / ISSUE | Code Reference | Existing Condition | Minimum Requirements | Recommendation | Cost | Photo/ Sheet |
|---|---|---|---|---|---|---|---|
| 1. | **SITE ENTRANCE SIGNAGE** | | | | | | |
| 1.1 | Adjacent to Accessible Parking | CA 724 *11298.5* CVC 22511.8 *MUTCD 2003, Ce Supplement Page 2B-36* | Complying TOW sign is wrong color | A sign shall be posted in a conspicuous place at each entrance to off-street parking facilities, or immediately adjacent to and visible from each stall or space. The sign shall not be less than 17 inches by 22 inches in size with lettering not less than 1 inch in height, which clearly and conspicuously states the following: "Unauthorized vehicles parked in designated accessible spaces not displaying distinguishing placards or license plates issued for persons with disabilities will be towed away at owner's expense. Towed vehicles may be reclaimed at ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ or by telephoning ___ ___ ___ ___ ___." Blank spaces are to be filled in with appropriate information as a permanent part of the sign. The Disabled Tow-Away (CA Code R100B) sign shall be placed immediately adjacent to, and visible from, the stall or space, or at each entrance to an off street parking facility to inform motorists that their vehicle will be towed away if they park in designated stalls or spaces without a special identification license plate or a distinguishing placard for disabled persons. Refer to CVC 22511.8 and 22511.9. | Install a California Department of Transportation R100B sign with complete information and letters 1 inch high minimum at each entrance to the off-street parking, or immediately adjacent to the designated accessible parking area. NOTE: CA Department of Transportation, R100B sign dimension is 18 inches wide, 24 inches tall. This is the correct size for a DOT R100B sign. | $250 | PHOTO 32 SHEET ADA-1 DETAIL 1 |
| | TOW SIGN | | | | | | |

Jones v 7-Eleven; 191 W. San Ysidro Blvd, San Ysidro, CA

Page 4 of 10

| Item | Location / ISSUE | Code Reference | Existing Condition | Minimum Requirements | Recommendation | Cost | Photo/ Sheet |
|---|---|---|---|---|---|---|---|
| 2. | **PATH OF TRAVEL** | | | | | | |
| 2.1 | PATH OF TRAVEL | Site | CA T 24 1114B.1.2 | There is no complying path of travel from: | When a building, or portion of a building, is required to be accessible or adaptable, an accessible route of travel shall be provided to all portions of the building, to accessible building entrances and between the building and the public way. | Provide an Accessible Path of Travel from the property boundary to the building entry. | $10,381 | PHOTO 27 28 29 30 31 |
| | | ADAAG 4.3.2(1) | 1.  The Public sidewalk to the facility Entrance. | At least one accessible route within the boundary of the site shall be provided from public transportation stops, accessible parking and accessible passenger loading zones, and public streets or sidewalks, to the accessible building entrance they serve. | A ramp is required from the public sidewalk to reach the concrete walk that leads to the entry door. | | SHEET ADA – 1 DETAIL 4 |
| | | 28 CFR Part 36 § 36.304 | | The accessible route shall, to the maximum extent feasible, coincide with the route for the general public. At least one accessible route shall connect accessible buildings, facilities, elements and spaces that are on the same site. | The location of the ramp requires the existing concrete steps to be removed and rebuilt to a narrower dimension. This cost is included in the total to the right. | | |
| | | | | At least one accessible route within the boundary of the site is provided to an accessible building entrance from:<br><br>• Public transportation stops.<br>• Accessible parking spaces.<br>• Accessible passenger loading zones.<br>• Public streets and sidewalks. | | | |

Jones v 7-Eleven; 191 W. San Ysidro Blvd, San Ysidro, CA

Page 5 of 10

| Item | Location / ISSUE | Code Reference | Existing Condition | Minimum Requirements | Recommendation | Cost | Photo/ Sheet |
|---|---|---|---|---|---|---|---|
| 2.2 | Exterior PATH OF TRAVEL SIGNAGE | CA T 24 1127B.3 | At this time there is no complying path of travel from the property boundary to the facility entrance. When the required path of travel is provided, signage directing individuals with disabilities from the public sidewalk to the building entrance will be required. | At every primary public entrance and at every major junction along or leading to an accessible route of travel, there shall be a sign displaying the International symbol of accessibility. Signs shall indicate the direction to accessible building entrances and facilities. | Install complying signage at the Path of Travel | $150 | PHOTO 27 28 SHEET A-1 & ADA-1 DETAIL 5 |
| 2.3 | Path of Travel LOWER CURB CUT RAMP LANDING | CA T 24 1133B.5.1 ADAAG 4.8.4 | Lower landing slope is 2.2 % | Level ramp landings shall be provided at the top and bottom of each ramp. Intermediate landings shall be provided at intervals not exceeding 30 inches of vertical rise and at each change of direction. Landings are not considered in determining the maximum horizontal distance of each ramp. Landing shall be level as specified in the definition of "level area" in "Section 202. | Remove and replace lower landing with a landing that slopes no greater than 2% in any direction. | $620 | PHOTO 9 10 11 12 |
| 2.4 | Path of Travel CURB CUT RAMP FROM DESIGNATED ACCESSIBLE SPACE TO ENTRY | CA T 24 1127B.5.9 ADAAG 4.7.7 4.29.2 | Ramp slope is 6-7% | Detectable Warnings. A curb ramp shall have a detectable warning complying with 4.29.2. The detectable warning shall extend the full width and depth of the curb ramp.

Detectable Warnings on Walking Surfaces. Detectable warnings shall consist of raised truncated domes with a diameter of nominal 0.9 in (23 mm), a height of nominal 0.2 in (5 mm) and a center-to-center spacing of nominal 2.35 in (60 mm) and shall contrast visually with adjoining surfaces, either light-on dark, or dark-on-light. The material used to provide contrast shall be an integral part of the walking surface. | Provide detectable warning material to sloped surface of the curb ramp. | $573 | PHOTO 13 14 15 16 |

Jones v 7-Eleven; 191 W. San Ysidro Blvd, San Ysidro, CA

Page 8 of 10

| Item / ISSUE | Location / ISSUE | Code Reference | Existing Condition | Minimum Requirements | Recommendation | Cost | Photo / Sheet |
|---|---|---|---|---|---|---|---|
| 3. | PARKING | | | | | | |
| 3.1 | Parking<br><br>VAN STALL SIGNAGE | CA T 24 1129B.5<br><br>ADAAG 4.6.4<br><br>MUTCD 2003 CALIFORNIA SUPPLEMENT<br><br>MUTCD 2004 PART 1 GENERAL<br><br>MUTCD 2003, Ca Supplement Page 2B-38 | Parking signage does not include a separate Van Parking sign at Ven Stall | Van accessible parking spaces have additional sign mounted below symbol of accessibility that states "VAN ACCESSIBLE."<br><br>Standard:<br>In accordance with CVC Section 21431, only traffic control devices conforming to Department of Transportation standards and specifications shall be placed on streets and highways.<br><br>Subject to the requirements in CVC Sections 21100, 21100.1, 21107, 21107.5, 21107.6, and 21107.7, no person shall install or maintain in any area of private property used by the public any sign, signal, or marking or other device intended to regulate, warn, or guide traffic unless it conforms with Department of Transportation standards and specifications.<br><br>The VAN ACCESSIBLE (R7-8a or R7-8b) sign shall be mounted below the Disabled Parking Only (CA Code R99) sign of the disabled person parking space designated as the van accessible space as provided in the California Building Standards Code Section 3107.1(c). | Install complying separate VAN ACCESSIBLE signage | $125 | PHOTO 32 |
| 3.2 | Parking<br><br>PARKING STALL AISLE SLOPE | CA T 24 1129B.4.4<br><br>ADAAG 4.6.3 | Slope of accessible parking stall aisle is 3.1% | Surface slopes of accessible parking spaces shall be the minimum possible and shall not exceed 1 unit vertical to 50 units horizontal (2% slope) in any direction. | Raise level of accessible stall and aisle to slope no greater than 2% in any direction. | $750-1,500 | PHOTO 1 2 |
| 3.3 | Parking<br><br>PARKING STALL SLOPE | CA T 24 1129B.4.4<br><br>ADAAG 4.6.3 | Slope of accessible parking stall aisle is 3% | Surface slopes of accessible parking spaces shall be the minimum possible and shall not exceed 1 unit vertical to 50 units horizontal (2% slope) in any direction. | Raise level of accessible stall and aisle to slope no greater than 2% in any direction. | $750-1,500 | PHOTO 4 5 |

Case 3:04-cv-02186-JM-POR   Document 82   Filed 03/17/06   PageID.1377   Page 73 of 136
FEB-27-2006 13:09 FROM:LAW OFFICE   HUBBARD 530 894 8244   TO:9494801217   P.26/51

Page 7 of 10

| ...to, CA | Minimum Requirements | Recommendation | Cost | Photo/ Sheet |
|---|---|---|---|---|
| ...or | | | | |
| ...le stall is: ...hes by 48-1/2 ... ...tlined in white. | Figure 3B-19, International Symbol of Accessibility Parking Space Marking with Blue Background and White Border Options Standard: MUTCD Figure 3B-19 is deleted and replaced with Figure 3B-19 (CA). | Install complying ISA | $250 | PHOTO 6 7 8 |
| ...n white. ...wrong height: 59". | Where permanent identification is provided for rooms and spaces, signs shall be installed on the wall adjacent to the latch side of the door. Where there is no wall space to the latch side of the door, including at double leaf doors, signs shall be placed on the nearest adjacent wall. Mounting height shall be 60 in above the finish floor to the centerline of the sign. Mounting location for such signage shall be so that a person may approach within 3 in of signage without encountering protruding objects or standing within the swing of a door.

Entrance signs. All building entrances that are accessible to and usable by persons with disabilities shall be identified with a minimum of one International Symbol of Accessibility and with additional directional signs, utilizing the symbol, at junctions, to be visible to persons along approaching pedestrian ways. | Remove non complying sign and install complying sign, centered 60 inches above the floor on the storefront panel adjacent to the latch side of the door. | $50 | PHOTO 20 21 22 |

Jones v 7-Eleven; 191 W. San Ysidro Blvd, San Ysidro, CA

| Item | Location / Issue | Code Reference | Existing Condition | Minimum Requirements | Recommendation | Cost | Photo Sheet |
|---|---|---|---|---|---|---|---|
| 3.4 | Parking<br><br>ISA SYMBOL IN ACCESSIBLE PARKING STALL | MUTCD Fig 3B-19 (CA) | ISA in accessible stall is:<br>1. 42 inches by 49-1/2 inches<br>2. Faded<br>3. Not outlined in white. | Figure 3B-19. International Symbol of Accessibility Parking Space Marking with Blue Background and White Border Options Standard: MUTCD Figure 3B-19 is deleted and replaced with Figure 3B-19 (CA). | Install complying ISA<br> | $250 | 6<br>7<br>8 |
| 4 | DOORS | | | | | | |
| 4.1 | South Entry Door<br><br>MISSING ISA SIGNAGE | CA T 24 1117B.5.7<br><br>1117B.5.8.1.2<br><br>ADAAG 4.30.6 | ISA sign is red on white.<br><br>ISA mounted at wrong height; 59". | Where permanent identification is provided for rooms and spaces, signs shall be installed on the wall adjacent to the latch side of the door. Where there is no wall space to the latch side of the door, including at double leaf doors, signs shall be placed on the nearest adjacent wall. Mounting height shall be 60 in above the finish floor to the centerline of the sign. Mounting location for such signage shall be so that a person may approach within 3 in of signage without encountering protruding objects or standing within the swing of a door.<br><br>Entrance signs. All building entrances that are accessible to and usable by persons with disabilities shall be identified with a minimum of one International Symbol of Accessibility and with additional directional signs, utilizing the symbol, at junctions, to be visible to persons along approaching pedestrian ways. | Remove non complying sign and Install complying sign, centered 80 inches above the floor on the storefront panel adjacent to the latch side of the door. | $50 | 22<br>23 |

Jones v 7-Eleven: 181 W. San Ysidro Blvd, San Ysidro, CA

Page 8 of 10

| Item | Location / ISSUE | Code Reference | Existing Condition | Minimum Requirements | Recommendation | Cost | Photo/Sheet |
|---|---|---|---|---|---|---|---|
| 4.2 | Entry Door LANDING SLOPE | CA T 24 1133B.2.4 | The landing slope is 2.4% in front of the door and 9.1% on the left side of the landing. | Floor level at doors. Regardless of the occupant load, there shall be a floor or landing on each side of a door. | Remove landing and replace with landing that slopes does not exceed 2% in any direction. | $895 | PHOTO 17 18 19 20 21 |
| 5 | PUBLIC TELEPHONES | | | | | | |
| 5.1 | Exterior Public Telephone | CA T 24 1117B.2.9 ADAAG 4.1.3.17(b) | There is no ADA signage at the public telephones | Public telephones with volume control shall be hearing aid compatible and shall be identified by a sign containing a depiction of a telephone handset with radiating sound waves. | Provide complying signage. | $67 | PHOTO 24 25 26 |
| | SIGNAGE | | | | | | |
| 6 | COUNTER | | | | | | |
| 6.1 | Check Out Counters AT Front Of Store | CA T24 1122B.4 ADAAG 7.2(1) | Counter height is 36-1/4" above floor surface. Counter does not have 36 inch wide clear space. | The tops of tables and counters shall be 28 inches to 34 inches) from the floor or ground. Where a single counter contains more than one transaction station, such as (but not limited to) a bank counter with multiple teller windows or a retail sales counter with multiple cash register stations, at least 5 percent, but never less than one, of each type of station shall be located at a section of counter that is at least 36 inches long and no more than 28 to 34 inches high. | Lower a 36 inch wide section of counter to between 28 and 34 inches from floor and provide 36" wide clear space. | $488 | PHOTO 33 34 35 36 |
| | CLEAR SPACE AT COUNTER TOP | | | | | | |
| 6.2 | Coffee Counter REACH RANGE | CA T24 1118B.6 ADAAG 4.2.6 | The height of the counter over which one must reach for the coffee dispenser is 38 inches from the floor. | Side reach. If the side reach is over an obstruction, the reach and clearances shall be as shown in Figure 11B-6D (c). See Figure 11B-5D. Maximum height of obstruction is 34 inches above the floor. | Lower a section of counter to between 28 and 34 inches from floor and provide side reach access over an obstruction. | $488 | PHOTO 37 |

Jones v 7-Eleven; 191 W. San Ysidro Blvd, San Ysidro, CA

Page 9 of 10

| Item | Location / ISSUE | Code Reference | Existing Condition | Minimum Requirements | Recommendation | Cost | Photo/ Sheet |
|---|---|---|---|---|---|---|---|
| | **SIGNS AND IDENTIFICATION** | | | | | | |
| 7.1 | Exit Doors  SIGNAGE | ADAAG 4.1.3(16) (a) | There are no tactile exit signs at the fire exits. | Signs which designate permanent rooms and spaces shall comply with 4.30.1, 4.30.4, 4.30.5 and 4.30.6.  **4.30.4 Raised and Brailled Characters and Pictorial Symbol Signs (Pictograms).** Letters and numerals shall be raised 1/32 in minimum, upper case, sans serif or simple serif type and shall be accompanied with Grade 2 Braille. Raised characters shall be at least 5/8 in high, but no higher than 2 in. Pictograms shall be accompanied by the equivalent verbal description placed directly below the pictogram. The border dimension of the pictogram shall be 6 in minimum height.  **4.30.5 Finish and Contrast.** The characters and background of signs shall be eggshell, matte, or other non-glare finish. Characters and symbols shall contrast with their background either light characters on a dark background or dark characters on a light background. | Install signs at each of two emergency exit. or | $100 ea | |

Jones v 7-Eleven; 191 W. San Ysidro Blvd, San Ysidro, CA

| Item | Location / ISSUE | Code Reference | Existing Condition | Minimum Requirements | Recommendation | Cost | Photo/ Sheet |
|---|---|---|---|---|---|---|---|
| | | 4.30.6 | | **4.30.6 Mounting Location and Height.**<br><br>Where permanent identification is provided for rooms and spaces, signs shall be installed on the wall adjacent to the latch side of the door. Where there is no wall space to the latch side of the door, including at double leaf doors, signs shall be placed on the nearest adjacent wall. Mounting height shall be 60 in above the finish floor to the centerline of the sign. Mounting location for such signage shall be so that a person may approach within 3 in of signage without encountering protruding objects or standing within the swing of a door. | | | |
| | | 1115B.6.2.4.1 | | | | | |

**Legend**  Italics = California Title 24 Accessibility Requirements

  Non-Italics = Americans With Disabilities Act

**4.27.4**  California Vehicle Code

**CVC**  Congressional Federal Register

**CFR**

**MUTCD**  Manual of Uniform Traffic Control Devices (2003) California Supplement.

FEB-27-2006 13:14 FROM:LAW OFF   L HUBBARD 530 894 8244       TO    894801217       P.30/51



Photo 2



2510 Jones v 7-Eleven

Photo 1

FEB-27-2006 13:15 FROM:LAW OFF   L HUBBARD 530 894 8244          TO   94801217          P.31/51



Photo 4



2510 Jones v 7-Eleven

Photo 3

FEB-27-2006 13:16 FROM:LAW OFFICE L HUBBARD 530 894 8244          TO:     94801217          P.32/51



FEB-27-2006 13:17 FROM:LAW OFFICE L HUBBARD 530 894 8244   TO: 94801217   P.33/51



Photo 10



2510 Jones v 7-Eleven

Photo 9



Photo 12



2510 Jones v 7-Eleven

Photo 11



Photo 14



2510 Jones v 7-Eleven

Photo 13

FEB-27-2006 13:20 FROM:LAW OFFICE L HUBBARD 530 894 8244        TO:    94801217           P.36/51



Photo 16



2510 Jones v 7-Eleven

Photo 15



Photo 18





Photo 19

2510 Jones v 7-Eleven



Photo 17

FEB-27-2006 13:21 FROM:LAW OFFICE L HUBBARD 530 894 8244        TO:     94801217        P.38/51



Photo 21



2510 Jones v 7-Eleven

Photo 20

FEB-27-2006 13:22 FROM:LAW OFF▲L HUBBARD 530 894 8244         TO:▲94801217         P.39/51



Photo 23

Photo 22

2510 Jones v 7-Eleven



Photo 25



2510 Jones v 7-Eleven

Photo 24

FEB-27-2006 13:23 FROM:LAW OFFICE L HUBBARD 530 894 8244          TO:  94801217          P.41/51



Photo 27



Photo 28



2510 Jones v 7-Eleven

Photo 26

FEB-27-2006 13:24 FROM:LAW OFF  L HUBBARD 530 894 8244    TO:  94801217    P.42/51



Photo 30



2510 Jones v 7-Eleven

Photo 29



Photo 32



2510 Jones v 7-Eleven

Photo 31

FEB-27-2006 13:26 FROM:LAW OFF L HUBBARD 530 894 8244          TO: 4801217          P.44/51



Photo 34



2510 Jones v 7-Eleven

Photo 33



Photo 36



2510 Jones v 7-Eleven

Photo 35

FEB-27-2006 13:27 FROM:LAW OFF   L HUBBARD 530 894 8244          TO   9480121Z          P.46/51



Photo 38



Photo 39



2510 Jones v 7-Eleven

Photo 37

FEB-27-2006 13:28 FROM:LAW OFF   L HUBBARD 530 894 8244      TO:   94801217      P.47/51



2510 Jones v 7-Eleven

Photo 40

Photo 41

Photo 42

Photo 43

Figure 3B-19 (CA). Disabled Persons Parking Symbol

MUTCD



NOTE:  The design detail for the symbol is also shown in the Department of Transportation's Standard Plans.



251D Jones v 7-Eleven

Photo 44



2510 Jones v 7-Eleven

24" MAX.

46" MAX.

30"

34" MAX.

( c ) MAXIMUM SIDE REACH OVER OBSTRUCTION

THESE DIAGRAMS ILLUSTRATE THE SPECIFIC REQUIREMENTS
OF THESE REGULATIONS AND ARE INTENDED ONLY AS AN AID
FOR BUILDING DESIGN AND CONSTRUCTION

FIGURE 11B-5D—SIDE REACH

# Exhibit B

# Harold Littlejohn, CPA, JD
## 1208 Mangrove Avenue
## Chico, California 95926
## 530-895-3353

**Accounting
Experience
Summary**

Extensive experience providing certified public
accounting, including business planning,
pro-forma projections, individual and corporate
tax preparation and financial advising services.

**Professional
Experience**

Harold Littlejohn, CPA      Self-employed CPA
1208 Mangrove Avenue      March 1990-Present
  Chico, California  95926

Slover & Lotspeich, CPA's Staff Accountant
Chico, California            Jan-September  1989

Charles H Littlejohn, PA      Staff Accountant
2756 Park Boulevard          Jan 1981-Dec 1988
Oakland, California  94606

Specialized Management      Staff Accountant
               Support      Feb-Dec 1980
Campbell, California

**Education**

2000    Juris Doctor, Cal Northern School of Law
Chico, California

1979    Bachelor of Science, Accounting
California State University, Chico

**Professional
Associations**

Professor of Taxation, Cal Northern School of Law
Chico, California

**References**

Professional references available upon request

1  Scott J. Ferrell, SBN 202091
2  Julie R. Trotter, SBN 209675
   CALL, JENSEN & FERRELL
3  A Professional Corporation
   610 Newport Center Drive, Suite 700
4  Newport Beach, CA  92660
   (949) 717-3000
5  sferrell@calljensen.com
6  jtrotter@calljensen.com

7  Attorneys for Defendants TRIPLE STAR, INC. DBA 7-ELEVEN
   and FIFTH STEVENSON PROPERTIES CORP.
8

9            UNITED STATES DISTRICT COURT
10
            SOUTHERN DISTRICT OF CALIFORNIA
11

| | |
|---|---|
| 12  GYPSIE JONES, | Case No.  04 CV 2186 JM (POR) |
| 13          Plaintiff, | **DEFENDANTS' REBUTTAL EXPERT** |
| 14      vs. | **DESIGNATION AND REPORT OF** **NEAL CASPER** |
| 15  TRIPLE STAR, INC. dba 7-ELEVEN; | |
| 16  FIFTH STEVENSON PROPERTIES | |
| 17  CORP.; and DOES 1 through 10, | |
| 18          Defendants. | |
| 19 | |

20                              Complaint Filed:   October 30, 2004
                               Trial Date:          January 9, 2006
21

22        Pursuant to Federal Rule of Civil Procedure 26, Defendants, through their

23  attorneys of record, hereby disclose the following retained rebuttal expert:

24        Neal Casper, Casper Development Resources, Inc., 6405 Lake Kathleen Avenue,

25  San Diego, CA 92119, contact number: (619) 741-1080.

26

27        1.    Written Report:  A true and correct copy of Mr. Casper's written report is

28  attached hereto as Exhibit "A."

CALL, JENSEN &
FERRELL
PROFESSIONAL
CORPORATION

**EXHIBIT G**

SEV02-05:190077_1:3-13-06                - 1 -

DEFENDANTS' EXPERT REBUTTAL DESIGNATION AND REPORT OF NEAL CASPER

2.   Basis for Opinions and Information Considered Or Relied Upon:   Mr. Casper's testimony will be based on his first-hand knowledge resulting from his visits to the subject Store, as well as information, knowledge and experience he has obtained as an Accessibility Plan Checker certified by the International Code Counsel, his nine years experience as a construction project manager and owner's representative, and the over 200 facility surveys he has performed.

3.   Qualifications of Expert:   A true and correct copy of Mr. Casper's information sheet is attached hereto as Exhibit "B."

4.   Publications Authored Within the Preceding Ten Years:   Mr. Casper has not authored any publications within the preceding ten years.

5.   Compensation for Services:   Mr. Casper's hourly rate for depositions and travel time is $200 per hour.  Mr. Casper's minimum daily rate for court testimony is $1,600.

6.   Prior Testimony at Trial or Deposition in the Preceding Four Years:   Mr. Casper has not testified at trial or in deposition in the past four years.

Dated:  March 13, 2006

CALL, JENSEN & FERRELL
A Professional Corporation
SCOTT J. FERRELL
JULIE R. TROTTER


By: Julie R. Trotter
    Julie R. Trotter

Attorneys for Defendants TRIPLE STAR, INC.
DBA 7-ELEVEN and FIFTH STEVENSON
PROPERTIES CORP.

CALL, JENSEN &
FERRELL
PROFESSIONAL
CORPORATION

SEV02-05:190077_1:3-13-06                    - 2 -

DEFENDANTS' EXPERT REBUTTAL DESIGNATION AND REPORT OF NEAL CASPER



## Casper Development Resources, Inc.

PROJECT PLANNING · ENTITLEMENT · CONSTRUCTION MANAGEMENT
PROJECT MANAGEMENT · ADA COMPLIANCE

### Defendant's ADA Expert Rebuttal Report

### 7-Eleven No. 17825 – 191 W. San Ysidro Blvd, San Ysidro CA

1.      I am the President of Casper Development Resources, Inc. and a California licensed general contractor.   In addition, I am certified by the International Code Counsel as an Accessibility Plan Checker.  I have nine years experience as a construction project manager and owners representative coordinating commercial projects throughout Southern California.  I have performed over 200 facility surveys for compliance with the Americans with Disabilities Act.  A summary of my qualifications is attached hereto as Attachment "A".

2.      I regularly provide consultation and advice to property owners, general contractors, architects and engineers concerning the American's with Disabilities Act and the new construction and alteration requirements set forth in the Americans with Disabilities Act Guidelines and the accessibility sections of California's Title 24 Building Code.

3.      I have reviewed and am familiar with the sections of the ADAAG and Title 24 building codes referenced in my declaration below.

6405 Lake Kathleen Avenue, San Diego, CA  92119      (619) 741-1080 Office      (619) 741-2062 Fax

**EXHIBIT A**

4.    I was retained as an expert witness by the law firm of Call, Jensen & Ferrell and informed that Plaintiff Gypsie Jones has filed the instant lawsuit alleging that she encountered barriers of accessibility at the 7-Eleven No. 17825 located at 191 W. San Ysidro Blvd, San Ysidro California.

5.    In reaching the opinions set forth below, I have reviewed and analyzed the data and other information relating to the physical configuration of the 7-Eleven including the Complaint filed by Plaintiff in this matter, the deposition testimony of Plaintiff Ms. Jones dated May 24, 2005, the deposition testimony of Plaintiff's expert Reed Settle dated August 22, 2005, Plaintiff's Expert Report dated August 16, 2005 prepared by Reed Settle, Plaintiff's Expert Report dated December 12, 2005 prepared by Harold Littlejohn, and Defendant's ADA Expert Rebuttal Report dated August 29, 2005 prepared by Bill Norkunas.   In addition, I visited the site on February 3, 2006 and again on March 13, 2006 and have prepared photographs.  A true and correct copy of my photographs pertaining to the issues addressed in my expert report is attached hereto as Exhibit "B".

6.    This report is limited to the reported barriers Plaintiff Ms. Jones identified she encountered or had knowledge of in her deposition testimony on May 24, 2005.

7.    <u>Public Restrooms</u> - Ms. Jones stated in her deposition testimony that the 7-Eleven lacked public restrooms.   The ADA does not require

places of public accommodation to provide public restrooms, but rather requires that when the restrooms are in fact provided, that they be accessible to customers with disabilities. (ADAAG 4.1.3(11))   This 7-Eleven does not have a restroom usable by the public and is therefore in compliance with the ADA.

8. <u>Access from Public Sidewalk</u> - Ms. Jones stated in her deposition that the 7-Eleven lacked access from the public street.   Since her visit, 7-Eleven has provided a route from the public sidewalk to the building entrance along the southeast property line.   The parking in this area was eliminated and a 4' wide path of travel was leveled and striped from the public sidewalk northerly to connect with the parking access aisle and the curb ramp.   The running slope of the walk is less than 5% and the cross slope is less than 2%.   A sign with the ISA and a directional arrow has been posted at the entrance to the route from the public sidewalk.   This facility provides an accessible route from the public right-of-way to the accessible building entrance in compliance with the ADA and California Title 24.

9. <u>Ramp Landing</u> - Ms. Jones stated in her deposition that a parking lot light obstructed the path from the accessible parking access aisle to the curb ramp.   Based on my inspection, there is a minimum 4' wide accessible route from the access aisle to the lower landing of the curb ramp.   The route provides an opening of 64" between the bottom of the curb ramp and the lot light base.   This space is in compliance with the requirements of the ADA and California Title 24.

Jones v. 7-Eleven
Expert Rebuttal Report

3 of 9

10.  <u>ISA at Accessible Entrance</u> - Ms. Jones stated in her deposition that the main entry door did not have an ISA symbol.  ADAAG 4.1.2(7)(a) only requires buildings which have multiple entrances where some are not accessible to display the ISA at the accessible entrances.  In addition, this building was built in 1976 so the 2001 California Title 24 Building Code does not apply to this feature.   The 7-Eleven entrance has an ISA mounted to the right of the doors depicting a wheelchair in white on a blue background.  Plaintiff's expert sites CA T24 1117B.5.7 and ADAAG 4.30.6 which describes mounting heights and locations of signs which identify permanent rooms and spaces.  This is not one of those signs.  The ISA at accessible entrances is governed by CA T24 1117B.5.8 and ADAAG 4.30.7 which do not specify a mounting height or location.   The ISA at accessible entrances is intended to inform customers with disabilities as to the presence of an accessible entrance.    The California State Architect Office of Universal Design issued an opinion in their DSA Accessibility Checklist Revised 8/25/03 Section 17.15 that the ISA at the accessible entrance should be installed where persons in wheelchairs can see them at eye level.  The sign at the 7-Eleven is visible to customers using wheelchairs and is in compliance with the ADA and California Title 24.

11.  <u>Entrance Door Landing</u> - Ms. Jones stated in her deposition that she had difficulty with the building's entrance doors and that when she attempted to open them she rolled away from the doors.   Based on my inspection, the building's entrance is in compliance with ADAAG 4.13

Received   Mar-13-2006  05:01pm    From-6197412062          To-CALL, JENSEN & FERRE   Page  005

requiring a level landing on both sides of the door and accessible door hardware.    The 7-Eleven doors have a level exterior landing extending more than five feet from the face of the door with a slope in all directions of less than 2%.    The doors have compliant exterior pulls installed at a compliant height.  In addition the doors required force of five to six pounds to operate.   The entrance door at the 7-Eleven is in full compliance with the ADA and does not pose a barrier to access.

12.    <u>ATM Machine</u> - Ms. Jones identified in her deposition that the ATM was not located on an accessible route.    At the time of my inspection, the ATM was located along an accessible aisle and provided the required 30"x48" clear floor space adjacent the machine.   In addition the screen and controls were installed in compliance with ADAAG 4.34 and California Title 24 1117B.7.   The ATM machine at this 7-Eleven is in full compliance with the ADA and California Title 24.

13.    <u>Aisles</u> - Ms. Jones identified in her deposition that she had difficulty getting down some of the aisles at the 7-Eleven.   Based on my site inspection, the fixtures and displays at the 7-Eleven are sufficiently spaced and except during temporary periods of stocking provide the space required by ADAAG 4.3.3 and figure 7a and 7b.   The aisles at this 7-Eleven are in compliance with the ADA.

14.    <u>Merchandise Heights</u> - Ms Jones identified in her deposition that she was unable to reach the merchandise.    The ADA does not have a

requirement for merchandise heights for retail and general merchandise businesses. In addition 7-Eleven has staff available to assist any and all customers needing assistance in reaching their merchandise.

15. <u>Cash Register Counter</u> - Ms. Jones identified in her deposition that the cash register counter was too high. Based on my site inspection, the cash register counter is 36-1/4" high. ADAAG 7.2.1 states that retail stores where counters have cash registers and are provided for sales or distribution of goods or services to the public shall have a portion of the counter which is at least 36" in length with a maximum height of 36". ADAAG section 3.2 states that all dimensions are subject to conventional building industry tolerances for field conditions. Based on the fact that ¼" is within an acceptable tolerance as allowed by ADAAG 3.2, this counter is in compliance with the ADA.

16. <u>POS Machine</u> - Ms. Jones identified in her deposition that the POS machine at the cash register counter was too high. Based upon my site inspection, the POS Machine is installed in compliance with ADAAG 4.34 and California Title 24 1117B.7. The POS Machine is mounted so that the controls require a reach of no more than 48", the screen is centered at 43"and rotated less than 60 degrees away from customers and is visible to customers using wheel chairs. The POS machine is in compliance with the ADA and California Title 24.

17. <u>Van Accessible Parking Sign</u> - Ms. Jones identified in her deposition testimony that the van accessible parking was not identified by a separate van sign. Neither ADAAG 4.6.4, California Title 24 1129B.5 nor CVC 22511.8 requires the additional van sign to be a separate sign. All three codes require the additional wording "Van Accessible" to be posted on the sign underneath the symbol of accessibility. The fact that both of these requirements were accomplished through the installation of one sign in no way poses a barrier or violates the referenced codes. Plaintiff's expert cites CVC Section 21401 and 21100 through 21107 as requiring a sign in conformance with the MUTCD (R7-8a or 8b) to be installed. CVC Section 21107.8 states that private parking lots are required to conform to the CVC only when a local city or county has passed a resolution at a public hearing that the parking lot is subject to public control and when the property owner has posted a sign of a type described in the code warning customers that the off-street parking facility is subject to public traffic regulations and control. Neither of these actions has occurred for this site. The 7-Eleven parking lot is not subject to the CVC (except for specific sections referring to private off-street parking lots) and is not subject to the requirements of section 21401 requiring conformance with the MUTCD. However, 7-Eleven has installed a separate van sign at the accessible parking stall. The accessible parking signage at this site is in full compliance with the ADA, California Title 24 and the CVC Section 22511.8.

18. <u>Tow Away Signage</u> - Ms Jones identified in her deposition testimony that the tow away sign did not have a phone number. The tow-

Received   Mar-13-2006  05:01pm     From-6197412062              To-CALL, JENSEN & FERRE    Page  008

away information including company and phone number has been completed on both of the signs installed at the 7-Eleven.   Plaintiff's expert sites CA T24 1129B.5, CVC 22511.8 and the MUTGCD 2003 California Supplement Page 2B-38.   The tow-away signs installed at this site are in compliance with both California Title 24 and CVC 22511.8.   Neither of these codes refers to the color of the sign but rather to the size, wording and placement. The MUTCD is not applicable to this site since, as described in response 17, this has not completed the steps necessary under the CVC to be subject the sections requiring compliance with the MUTCD.   In addition, the ADA does not require tow-away signage.

19.   <u>Accessible Parking</u> - During my site visit I inspected the accessible parking.   Based on my inspection the required number of accessible parking stalls is provided and the parking is properly striped and configured.   The accessible parking stall is level and less than 2% slope in any direction, a minimum of 9' wide by 18' deep, has a van access aisle on the passenger side a minimum of 8' wide by 18' deep.   The stall is properly striped with an international symbol of accessibility on the asphalt at the rear of the stall and has a wall mounted accessible parking sign with additional van signage at the head of the stall.   The access aisle has "NO PARKING" striped in white in minimum 12" lettering visible to traffic enforcement officials.   The Plaintiff's expert sites MUTCD 3B-19 (CA).   As discussed in response 17, this site is not subject to the requirements of the MUTCD but rather to the ADA and certain sections of California Title 24.   The ADA does not require the ISA to be striped within the accessible parking stalls.

California Title 24 requires the ISA to be striped 36"x36" at the rear of the stall so it can be easily identified by customers and law enforcement. The ISA provided at the accessible parking is 56"x 56" which is equivalent in function as allowed under California Title 24 since it clearly identifies the stalls as reserved for customers with disabilities to approaching vehicles and law enforcement. The accessible parking as it is currently located, configured, and striped is compliant with the regulations promulgated pursuant to the American's with Disabilities Act Sections 4.1.2(5)(a) & (b), 4.6 and the 2001 California Building Code, Title 24, Part 2, Volume 1, Section 1129B.

Neal Casper

Neal Casper

Attachment B: Photographs

**Photo 1**



**Photo 2**



**Photo 3**



**Photo 4**



7-Eleven San Ysidro: 191 W San Ysidro Blvd, San Ysidro

1

Attachment B:  Photographs

**Photo 5**



**Photo 7**



**Photo 6**



**Photo 8**



7-Eleven San Ysidro:  191 W San Ysidro Blvd, San Ysidro

2

Attachment B:  Photographs

7-Eleven San Ysidro:  191 W San Ysidro Blvd, San Ysidro

3

Photo 9

Photo 11



Photo 10

Photo 12



Attachment B:   Photographs

Photo 13



Photo 15



Photo 14



Photo 16



7-Eleven San Ysidro:   191 W San Ysidro Blvd, San Ysidro

4

Attachment B: Photographs

Photo 17



Photo 19



Photo 18



Photo 20



7-Eleven San Ysidro:   191 W San Ysidro Blvd, San Ysidro

5

Attachment B:  Photographs

7-Eleven San Ysidro:  191 W San Ysidro Blvd, San Ysidro

6

Photo 23



Photo 21



Photo 24



UNAUTHORIZED VEHICLES
NOT DISPLAYING
DISTINGUISHING PLACARDS
OR LICENSE PLATES ISSUED
FOR DISABLED PERSONS
WILL BE TOWED AWAY
AT OWNER'S EXPENSE.

TOWED VEHICLES
MAY BE RECLAIMED AT

OR BY TELEPHONING
619 531 2000

Photo 22

Attachment B: Photographs

Photo 25




MAY BE RECLAIMED
OR BY TELEPHONING
619 531 2000

Photo 27




7-Eleven San Ysidro: 191 W San Ysidro Blvd, San Ysidro

7

Photo 26



Photo 28



Attachment B: Photographs

Photo 29



Photo 31



Photo 30



7-Eleven San Ysidro: 191 W San Ysidro Blvd, San Ysidro

8

Attachment B:   Photographs



**Photo 32**



**Photo 34**

7-Eleven San Ysidro:   191 W San Ysidro Blvd, San Ysidro

9



**Photo 33**



**Photo 35**

Attachment B:   Photographs

Photo 36



Photo 38



Photo 37



Photo 39



7-Eleven San Ysidro:   191 W San Ysidro Blvd, San Ysidro

10

Attachment B: Photographs

7-Eleven San Ysidro: 191 W San Ysidro Blvd, San Ysidro

11

Photo 42



Photo 40



Photo 43



Photo 41



Attachment B:  Photographs

Photo 44



Photo 46



Photo 45



Photo 47

7-Eleven San Ysidro:  191 W San Ysidro Blvd, San Ysidro

12

Attachment B:  Photographs

7-Eleven San Ysidro:  191 W San Ysidro Blvd, San Ysidro

13

Photo 50



Photo 48



Photo 51



Photo 449





7-Eleven San Ysidro: 191 W San Ysidro Blvd, San Ysidro

14

Attachment B: Photographs

**Photo 52**



**Photo 54**

**Photo 53**



**Photo 55**



# CURRICULUM VITAE

**NEAL CASPER**
**CASPER DEVELOPMENT RESOURCES, INC.**

6405 Lake Kathleen Avenue
San Diego, CA 92119
619.741.1080 (Office)
619.741.2062 (Fax)

## EDUCATION

1993   Bachelor of Arts Degree, Point Loma Nazarene College

## LICENSING / PROFESSIONAL CERTIFICATIONS (Current)

2000   California General Contractor License #B782059
2004   International Code Council - Certification #5236565-21
*Accessibility Inspector / Plans Examiner*

## PROFESSIONAL EXPERIENCE

**2003 – Present**   **Casper Development Resources, Inc.**
**Consultant**
- Accessibility Consulting
- Construction Management

**2001 - 2003**   **McDonald's Corporation**
**Construction Project Manager**
- Construction Management
- New Store Development
- Zoning & Entitlement

**1996 – 2001**   **San Diego County Credit Union**
**Construction Project Manager**
- New Branch Development
- Project Management
- Facilities Management

**EXHIBIT B**

Neal Casper
Page 2


**ACCESSIBILITY EXPERT SERVICES:**


**Law Offices of Grimm, Vranjes, McCormick & Graham LLP**
**550 C Street, San Diego**

| | | | |
|---|---|---|---|
| 1 | McDonald's 004-1215 | San Diego | Sep-04 |
| 2 | McDonald's 004-1323 | San Marcos | Aug-04 |
| 3 | McDonald's 004-0572 | Santa Ana | Aug-04 |


**Call, Jensen & Ferrell**
**610 Newport Center Drive, Irvine**

| | | | |
|---|---|---|---|
| 1 | Off 5th - Saks 5th Avenue | Folsom | Jan-06 |
| 2 | Popeyes | Westminster | Jan-06 |
| 3 | Carl's Jr. - Senior Classic Leasing | Los Angeles | Apr-05 |
| 4 | Roggenkamp V Wienerschnitzel | Anaheim | Dec-04 |
| 5 | Wienerschnitzel | Artesia | Dec-04 |
| 6 | Lopez V Del Taco | Victorville | Mar-05 |
| 7 | Sanford V Del Taco | Sacramento | Jan-06 |
| 8 | Sanford V Del Taco | Sacramento | Feb-06 |
| 9 | Harris V Del Taco | Lake Forrest | Mar-05 |
| 10 | Duran V Del Taco | Mission Viejo | Jun-05 |
| 11 | Jones V 7-Eleven | San Ysidro | Feb-06 |
| 12 | Baptiste V Carl's Jr. | Otay Mesa | Feb-06 |


**Lewis, Brisbois, Bisgaard and Smith**
**550 C Street, Suite 800 San Diego**

| | | | |
|---|---|---|---|
| 1 | Rifkin V Denny's | Ventura | Apr-05 |
| 2 | Hamburger Stand | El Centro | Sep-04 |
| 3 | Wienerschnitzel | Buena Park | Sep-04 |
| 4 | Wienerschnitzel | Orange | Nov-04 |
| 5 | KFC | San Clemente | Jul-04 |
| 6 | KFC | Santa Ana | Nov-04 |
| 7 | Radisson Hotel | Anaheim | Jul-04 |
| 8 | Taco Bell (Molski V Huang) | Norwalk | Mar-05 |
| 9 | Taco Bell | Stanton | Sep-04 |
| 10 | McDonald's 004-1110 | Irvine | Jan-06 |
| 11 | McDonald's 004-2512 | Pt Loma | Jun-04 |
| 12 | McDonald's 004-0327 | San Diego Clairemont | Jun-04 |
| 13 | McDonald's 004-2288 | San Diego - Aero Drive | Jan-05 |

Neal Casper
Page 3


**Morrison & Foerster LLP**
**12531 High Bluff Drive, Suite 100, San Diego**
  1  McDonald's 004-3485          San Diego        Apr-04


**Law Offices of Tom Molta**
**110 West C Street, Suite 1902, San Diego**
  1  Run Rite Auto              El Cajon        Nov-05


**Robinson, DiLando & Whitaker**
**800 Wilshire Blvd, Suite 1100, Los Angeles**
  1  Kung Pao House            Fullerton       Jan-06


## ACCESSIBILITY CONSULTING – PROPERTY SURVEYS

1. McDonald's Corporation   (Completed surveys at over 200 Locations)

2. Carl Karcher Enterprises

3. GVD Commercial Properties

4. Denny's

5. IHOP

6. Palacio Hospitality Group


## PRESENTATIONS / TRAINING

"Making Your Building Accessible"
    Presented September 2004 to So Cal KFC Franchisee Association

"Restaurant Accessibility"
    Presented July 2005 to Carl Karcher Enterprises, Inc

## PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action; my business address is 610 Newport Center Drive, Suite 700, Newport Beach, CA 92660.

On March 13, 2006, I served the foregoing documents described as: **DEFENDANTS' REBUTTAL EXPERT DESIGNATION AND REPORT OF NEAL CASPER** on the following person(s) in the manner indicated:

### SEE ATTACHED SERVICE LIST

[ ]    (BY MAIL) I am familiar with the practice of Call, Jensen & Ferrell for collection and processing of correspondence for mailing with the United States Postal Service. Correspondence so collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business. On this date, a copy of said document was placed in a sealed envelope, with postage fully prepaid, addressed as set forth herein, and such envelope was placed for collection and mailing at Call, Jensen & Ferrell, Newport Beach, California, following ordinary business practices.

[ X ]    (BY OVERNITE EXPRESS) I am familiar with the practice of Call, Jensen & Ferrell for collection and processing of correspondence for delivery by overnight courier. Correspondence so collected and processed is deposited in a box or other facility regularly maintained by Overnite Express that same day in the ordinary course of business. On this date, a copy of said document was placed in a sealed envelope designated by Overnite Express with delivery fees paid or provided for, addressed as set forth herein, and such envelope was placed for delivery by Overnite Express at Call, Jensen & Ferrell, Newport Beach, California, following ordinary business practices.

[ ]    (BY FACSIMILE TRANSMISSION) On this date, at the time indicated on the transmittal sheet, attached hereto, I transmitted from a facsimile transmission machine, which telephone number is (949) 717-3100, the document described above and an unsigned copy of this declaration to the person, and at the facsimile transmission telephone numbers, set forth herein. The above-described transmission was reported as complete and without error by a properly issued transmission report issued by the facsimile transmission machine upon which the said transmission was made immediately following the transmission.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on March 13, 2006, at Newport Beach, California.

Katie Dominick

1

## SERVICE LIST

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lynn Hubbard III
Scott Lynn J Hubbard, IV
Law Office of Lynn Hubbard
12 Williamsburg Lane
Chico, CA 95929
Fax No.: (530) 894-8244

**Attorneys for Plaintiff**

CALL, JENSEN &
FERRELL
PROFESSIONAL
CORPORATION

SEVEN ELEVEN

191 W. SAN YSIDRO BLVD.

SAN YSIDRO, CA.  92173


WE HAVE SHOPPED AT YOUR STORE OCCASIONALLY BUT EACH TIME I CANNOT

FIND VAN ACCESSIBLE PARKING.  I AM DISABLED AND I NEED THIS TO

UNLOAD MY WHEEL CHAIR PROPERLY.

THE LAST TIME I WAS THERE I ASKED TO USE YOUR REST ROOM AND WAS

TOLD YOU DID NOT HAVE A REST ROOM FOR THE PUBLIC.  THERE WERE

OTHER PROBLEMS AS WELL, AND I AM ASKING THAT YOU FIX THEM AT ONCE

AS I WILL UNDOUBTEDLY WANT TO COME IN AGAIN, AND AS IT IS I FEEL

DISCRIMINATED AGAINST BESIDES THE PAIN IT CAUSES ME TO TRY TO

REACH OBJECTS THAT ARE TOO HIGH.  THANK YOU.


 GYPSIE JONES

92192 FIRST STREET

COTTONWOOD, CA.  96022


**EXHIBIT H**

Δ π EXHIBIT 3

Deponent  Jones

Date  Rptr.

7-11
1001 N. HARBOR BLVD
ANAHEIM, CA.  92801


I RECENTLY STOPPED AT YOUR STORE WHILE VISITING DISNEY
LAND WITH MY FRIEND AND HER BOYS AND I FOUND MANY PROBLEMS
THAT CAUSED ME DISTRESS.  I AM CONFINED TO A WHEEL CHAIR
AND I NEED FULL ACCESSIBILITY.

FIRST, THERE WAS NO VAN ACCESSIBLE PARKING SPACE.

SECONDLY THERE WERE MANY ITEMS IN THE STORE THAT WERE
OUT OF MY REACH.

PLEASE TAKE CARE OF THESE PROBLEMS AT ONCE.


THANK YOU.



JERRY DORAN

14400 hwy  36 W.

COTTONWOOD, CA.  96022


**EXHIBIT I**

SEVEN ELEVEN

2400   HIGHLAND AVE

NATIONAL CITY, CA.   91950


WE FREQUENTLY STOP AT YOUR STORE AND THE LAST TIME WE WERE

THERE THERE WE HAD PROBLEMS.  WE ARE IN OUR EIGHTIES AND USE

WHEEL CHAIRS TO GET AROUND.

MANY ITEMS IN YOUR STORE ARE TOO  HIGH TO REACH.  ALSO YOUR

DOOR IS VERY HEAVY AND HARD TO OPEN.  WE ASKED TO USE YOUR REST

ROOM AND WERE TOLD YOU DID NOT HAVE A PUBLIC REST ROOM.

THEN WHEN WE WENT TO GET BACK IN OUR VAN WE FOUND SOMEONE PARKED

IN THE ACCESS AISLE AND HAD TO WAIT UNTIL THEY LEFT TO LOAD OUR

WHEEL CHAIRS.

PLEASE  TAKE CARE OF THESE PROBLEMS AT ONCE AS WE FELT VERY

DISCRIMINATED AGAINST.  THANK YOU.


BARBARA HUBBARD

BOX 66

IMPERIAL BEACH, CA.   91933

SEVEN ELEVEN

285 BROADWAY

CHULA VISTA, CA. 91910


I WAS RECENTLY IN YOUR AREA AND STOPPED BY YOUR STORE FOR A
COUPLE OF ITEMS AND SINCE I AM CONFINED TO A WHEEL CHAIR AND NEED
DISABLED ACCESSIBILITY, I HAD PROBLEMS.

FIRST I HAD DIFFICULTY GETTING INTO YOUR STORE BECAUSE OF THE
RAMP FROM THE PARKING SPACE. IT IS VERY NARROW AND STEEP.

AND SEVERAL OF THE ITEMS IN THE STORE WERE TOO HIGH TO REACH AND
SINCE THERE WAS ONLY ONE PERSON IN THE SOTRE I HAD TO ASK OTHER
CUSTOMERS FOR HELP AS THE STORE EMPLOYEE WOULDN'T LEAVE THE CASH
REGISTER. I FELT VERY STRESSED AND DISCRIMINATED AGAINST WHEN I
LEFT. I WAS ALSO TOLD THAT YOU DO NOT HAVE A PUBLIC REST ROOM.

PLEASE TAKE CARE OF THESE PROBLEMS AT ONCE. THANK YOU.


LARY R. FEEZOR

BOX 968

RED BLUFF, CA. 96080